UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

MARK DANIELS,

                    Plaintiff,

-against-

SUSAN MUELLER, et al.,

                    Defendants.

---

No. 23-CV-5654 (LAP)

OPINION AND ORDER

LORETTA A. PRESKA, Senior United States District Judge:

    Before the Court are eleven motions for summary judgment filed by various Defendants in the above-captioned case and nine related cases.  Plaintiff filed an omnibus brief opposing each motion for summary judgment.  (Plaintiff's Amended Memorandum of Law in Opposition to Defendants' Motions for Summary Judgment (Omnibus), dated February 5, 2024 ("Pl. Opp'n") [23-CV-5658, dkt. no. 59].)[1] For the reasons set forth below, certain of Defendants' motions are GRANTED and certain of Defendants' motions are DENIED.

I.  **Background**

    **A. Factual Background**

    The Court assumes familiarity with its decision in related case Allen v. Mueller, No. 23-CV-5651, 2024 WL 3090141 (S.D.N.Y.

---

[1] For omnibus submissions and documents that are relevant to all of the related actions, the Court will use general definitions. For documents that are specific to only one individual action, the Court will use definitions which identify the action's Plaintiff.

June 21, 2024).  A streamlined version of the relevant facts and procedural history follows.

The above-captioned action and the nine related individual actions that this Opinion addresses arise from a class action brought by several named New York State Department of Corrections and Community Supervision ("DOCCS") inmates on behalf of a class of individuals in DOCCS custody whose medications were denied or discontinued after the institution of the Medications With Abuse Potential ("MWAP") Policy.  See Allen v. Koenigsmann, No. 19-CV-8173, 2023 WL 2731733 (S.D.N.Y. Mar. 31, 2023).[2]  (See also Allen I, Plaintiff's Memorandum of Law in Support of Motion for Class Certification, dated May 18, 2022 ("Pl. Class Cert. Br.") [19-CV-8173, dkt. no. 371] at 14.)[3]

DOCCS adopted the MWAP Policy in June 2017.  (Defendant Mueller's Local Civil Rule 56.1 Statement of Undisputed Facts, dated November 15, 2023 ("Mueller 56.1 Stmt.: Stewart) [23-CV-5668, dkt. no. 19] ¶ 3.)  The MWAP Policy required any DOCCS medical provider who sought to prescribe certain medications to submit an "MWAP Request" to the DOCCS Regional Medical Director ("RMD") in charge of the medical provider's facility.  (See id.

---

[2] The Court will refer to the class action, 19-CV-8173, as "Allen I."

[3] Page numbers cited herein reflect ECF page numbers, rather than page numbers of the parties' submissions.  The Court will also cite page numbers using the various methods of pagination used by the parties in their exhibits (such as MD 000406).

¶ 5.)  Before the DOCCS medical provider had authority to prescribe the requested medication for long-term use for chronic conditions, the RMD would have to approve the MWAP Request.  (See id.)

The stated purpose of the MWAP Policy was to control the prescriptions of medications that DOCCS believed might carry the risk of abuse or dependence by DOCCS inmates.  (See Declaration of A.J. Agnew in Opposition to Motion for Summary Judgment, dated December 27, 2023 ("Agnew Decl.") [23-CV-5657, dkt. no. 29], Ex. 23 [23-CV-5667, dkt. no. 29-25] at 2.)  Medications that required RMD approval under the MWAP Policy included Gabapentin (Neurontin), Lyrica (Pregabalin), Baclofen, Flexeril (Cyclobenzaprine), Ultram (Tramadol), Percocet, and Oxycodone.  (See Mueller 56.1 Stmt.: Stewart ¶ 6.)  DOCCS rescinded the MWAP Policy on February 8, 2021.  (See State Represented Defendants' Local Civil Rule 56.1 Statement of Undisputed Facts, dated November 16, 2023 ("SRD 56.1 Stmt.: Gradia") [23-CV-5660, dkt. no. 24] ¶ 6.)

Plaintiffs in the class action asserted claims under 42 U.S.C. § 1983 alleging deliberate indifference to their medical needs due to DOCCS's implementation of the MWAP Policy and the discontinuation and denial of their medications that ensued.  (Allen I, Second Amended Complaint, dated December 12, 2020 [19-CV-8173, dkt. no. 256] at 137-39.)  Plaintiffs moved for class certification and for a preliminary injunction seeking relief from

the ongoing effects of the MWAP Policy, arguing that DOCCs was continuing to deny effective treatment to patients who had lost their medications due to the MWAP Policy. (Allen I, Class Cert. Br. at 14; Allen I, Plaintiff and Plaintiff-Intervenors' Memorandum of Law in Support of Motion for Injunctions, dated May 31, 2022 [19-CV-8173, dkt. no. 378] at 8-9.)

On March 31, 2023, this Court issued an Opinion granting the Allen I plaintiffs' motion to certify a class to pursue injunctive relief but denying the plaintiffs' motion to certify a class to pursue damages for liability. See Allen I, 2023 WL 2731733, at *6. The Court held that plaintiffs in Allen I had failed to show that the proposed "liability class" had standing to sue under Article III of the United States Constitution. See id. at *2.

Also on March 31, 2023, the Court granted the Allen I plaintiffs' motion for a preliminary injunction, determining plaintiffs had demonstrated ongoing constitutional violations, including medically unjustified discontinuations of MWAP treatment, and a likelihood of imminent future harm across the class. Allen I, No. 19-CV-8173, 2023 WL 2752375, at *6 (S.D.N.Y. Mar. 31, 2023).

After a four-day bench trial, this Court converted the preliminary injunction into a permanent injunction, concluding that remedying the constitutional violations in DOCCS' pain management practices outweighed the administrative challenges

4

DOCCS would face in implementing a permanent injunction. <u>Allen I</u>, 700 F. Supp. 3d 110, 145 (S.D.N.Y. 2023).  The Court then awarded attorneys' fees to Plaintiffs' counsel.  (<u>Allen I</u>, Order, dated February 22, 2024 [19-CV-8173, dkt. no. 850].)

Recently, the Court of Appeals affirmed this Court's decision to grant a permanent injunction and award Plaintiffs' counsel attorneys' fees.  <u>Daniels et al. v. Moores</u>, No. 24-30, 2025 WL 883035 (2d Cir. Mar. 21, 2025) (summary order).  The Court of Appeals credited the Court's determination that "the MWAP Policy was still <u>de facto</u> in place, despite being formally rescinded, because prisoners in DOCCS custody continued to have their MWAP medications systematically denied without medical justification and without regard to medical need."  (<u>Id.</u> at 6.)  In addition, the Court of Appeals found no error in the Court's conclusion that Plaintiffs suffered Eight Amendment violations and therefore irreparable harm.  (<u>Id.</u> at 7.)  In so holding, the Court of Appeals reiterated that "a deliberate indifference claim can lie where prison officials deliberately ignore the medical recommendations of a prisoner's treating physicians" and where defendants "reflexively rel[ied] on . . . the substance abuse policy when they had been put on notice that the medically appropriate decision could be, instead, to depart from the [policy] and prescribe [the medication] to the plaintiff."  (<u>Id.</u> at 9 (citing <u>Johnson v. Wright</u>, 412 F.3d 398, 404, 406 (2d Cir. 2005).)

Following this Court's denial of certification of a "liability class," various plaintiffs filed individual suits for damages against various DOCCS employees, including RMDs, physicians, and nurse practitioners ("NPs"). (See, e.g., Amended Complaint as Severed from Allen I, filed June 30, 2023 ("AC: Daniels") [23-CV-5654, dkt. no. 1] at 3-5.) Similar to the allegations made in the class action, these plaintiffs each alleged violations of 42 U.S.C. § 1983 based on deliberate indifference to their medical needs. (See, e.g., id. ¶¶ 349-72.) On June 21, 2024, the Court issued its first decision in one of the individual lawsuits, granting in part and denying in part defendants' motion for summary judgment. Allen v. Mueller, 2024 WL 3090141 at *1.

The Court's instant Opinion addresses the claims of ten plaintiffs: Plaintiffs Mark Daniels, Shannon Dickinson, Aaron Dockery, John Gradia, Angel Hernandez, Hugh Knight, Terry Mathis, Sean Pritchett, Felipe Rivera-Cruz, and Wayne Stewart. In each of these ten individual actions for damages, certain Defendants move for summary judgment to dismiss the claims against them, totaling eleven motions for summary judgment. Specifically, Defendants Dr. Susan C. Mueller, Dr. David Dinello, Dr. John Hammer, and NP Kristin Salotti (collectively the "State Represented Defendants" or "SRDs") have filed motions for summary judgment in nine of the

ten actions.[4]  In addition, Defendants Dr. Kathleen Mantaro (23-CV-5661, dkt. no. 24) and Dr. Chung Lee (23-CV-5662, dkt. no. 12) have each filed a motion for summary judgment in a single action where they are named as a defendant.

## II.  **Legal Standard**

Summary judgment is appropriate where the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "'It is the movant's burden to show that no genuine factual dispute exists.'"  I.M. v. United States, 362 F. Supp. 3d 161, 189 (S.D.N.Y. 2019) (quoting Vt. Teddy Bear Co. v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004)).  A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  "On a motion for summary judgment, a fact is material if it 'might affect the outcome of the suit under the governing law.'"  Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene of the City of N.Y.,

---

[4] Because some of the individual actions name only certain State Represented Defendants as defendants, their motions naturally only seek to dismiss the claims against the State Represented Defendant(s) named in that action.  Dr. Mueller is named as a defendant in nine of the ten severed actions, Dr. Dinello is a defendant in three, Dr. Hammer is a defendant in two, and NP Salotti is a defendant in one.

746 F.3d 538, 544 (2d Cir. 2014) (quoting Liberty Lobby, Inc., 477 U.S. at 248).

"'In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim.'" In re AXA Equitable Life Ins. Co. COI Litig., 595 F. Supp. 3d 196, 215 (S.D.N.Y. 2022) (quoting Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995)). In ruling on a motion for summary judgment, a court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." Brod v. Omya, Inc., 653 F.3d 156, 164 (2d Cir. 2011) (quotation marks and citations omitted).

"If the movant meets its burden, 'the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment.'" Kayo v. Mertz, 531 F. Supp. 3d 774, 787 (S.D.N.Y. 2021) (quoting Jaramillo v. Weyerhaeuser Co., 536 F.3d 140, 145 (2d Cir. 2008)). "The non-moving party 'cannot defeat the motion by relying on the allegations in [its] pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible.'" In re AXA, 595 F. Supp. 3d. at 215 (quoting Gottlieb v. Cnty. of Orange, 84 F.3d 511, 518 (2d Cir. 1996)). The non-

moving party must "create more than a 'metaphysical' possibility that his allegations [a]re correct; he need[s] to 'come forward with specific facts showing that there is a genuine issue for trial.'" Wrobel v. Cnty. of Erie, 692 F.3d 22, 30 (2d Cir. 2012) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986)).

## III. **Applicable Law**

### A. Eighth Amendment

The Eighth Amendment to the United States Constitution prohibits government officials from inflicting "cruel and unusual punishments" on those in their care. U.S. Const. amend. VIII. Pursuant to the right to be free from cruel and unusual punishments, the Eighth Amendment prohibits prisons officials from acting with "deliberate indifference to serious medical needs of prisoners[.]" Estelle v. Gamble, 429 U.S. 97, 104 (1976).

A prison official can be held liable for deliberate indifference in violation of the Eighth Amendment "only when two requirements are met." Salahuddin v. Goord, 467 F.3d 263, 279 (2d Cir. 2006) (internal quotations and citations omitted), abrogated in part on other grounds by Kravitz v. Purcell, 87 F.4th 111 (2d Cir. 2023). The first requirement the plaintiff must meet "is objective: the alleged deprivation of adequate medical care must be 'sufficiently serious.'" Id. (quoting Wilson v. Seiter, 501 U.S. 294, 298 (1991)). The second requirement "is subjective:

the charged official must act with a sufficiently culpable state of mind." Id. at 280.  Put differently, a plaintiff "must show, for each defendant, that the defendant acted with deliberate indifference to [his] medical needs." Brock v. Wright, 315 F.3d 158, 162 (2d Cir. 2003) (citing Estelle, 429 U.S. at 104).

Satisfying the objective prong entails two inquires.  First, the Court must assess "whether the prisoner was actually deprived of adequate medical care." Salahuddin, 467 F.3d at 279.  The second part of the objective inquiry asks whether the deprivation or inadequacy of the plaintiff's medical care is "sufficiently serious." Id. at 280.

Determining if the deprivation of medical care is sufficiently serious is "necessarily contextual and fact-specific" which requires "tailor[ing] [it] to the specific circumstances of each case." Smith v. Carpenter, 316 F.3d 178, 185 (2d Cir. 2003) (cleaned up) (internal quotations and citations omitted).  This includes examining the plaintiff's claim differently depending on whether he alleges the prison officials completely "fail[ed] to provide any treatment for [his] medical condition" or alleges only that the medical treatment he received was inadequate.  See Salahuddin, 467 F.3d at 280.

If the former, the Court must "examine whether the inmate's medical condition is sufficiently serious." Id. at 280 (emphasis added).  Certain factors courts consider when evaluating the

seriousness of a medical condition include whether "a reasonable doctor or patient would find [the condition] important and worthy of comment or treatment," whether the condition "significantly affects an individual's daily activities," or "the existence of chronic and substantial pain." Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998) (internal quotations and citations omitted). If, however, the plaintiff alleges only "inadequacy [] in the medical treatment [he was] given, the seriousness inquiry is narrower." Salahuddin, 467 F.3d at 280. Instead of determining the seriousness of the plaintiff's underlying condition, the Court must focus its inquiry "on the challenged delay or interruption in treatment[.]" Id. (citing Smith, 316 F.3d at 185). Such inquiry requires the Court to examine "the particular risk of harm" the plaintiff faced as a result of the deprivation, "rather than the severity of the [plaintiff's] underlying medical condition[.]" Smith, 316 F.3d at 186.

Accordingly, the Court inquires how serious the plaintiff's underlying medical condition is if he alleges he was entirely denied care, whereas it must assess the "particular risks attributable" to a provision of allegedly insufficient care or the "severity of [a] temporary deprivation" in care if that is the deprivation the plaintiff alleges. Id. at 186-87 (emphasis added).

11

To satisfy the subjective prong, _i.e._, to prove a prison official was deliberately indifferent to his or her medical needs, a plaintiff must "show that a particular defendant 'knows of and disregards an excessive risk to inmate health or safety.'" Brock, 315 F.3d at 164 (quoting Farmer v. Brennan, 511 U.S. 825, 837 (1994)).  This standard is akin to a mental state of subjective recklessness, as used in criminal law.  See Salahuddin, 467 F.3d at 280.  The plaintiff may demonstrate the defendant's knowledge either by proving the official had actual knowledge of the risks to the plaintiff's health or by proving "that the risk was obvious or otherwise must have been known to [the] defendant[.]" Brock, 315 F.3d at 164.

**B. Personal Involvement**

Plaintiffs assert their Eighth Amendment claims pursuant to 42 U.S.C. § 1983.  (See, e.g., AC: Daniels ¶¶ 349-80.)  To prevail on a § 1983 claim for a constitutional violation, "a plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution.'" Tangreti v. Bachmann, 983 F.3d 609, 618 (2d Cir. 2020) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009)).  Thus, to establish a particular defendant's liability, Plaintiffs must "establish that [the particular defendant] violated the Eighth Amendment by [his or her] own conduct, not by reason of [his or her] supervision of others who committed the violation" and that

each particular defendant "knew of and disregarded an excessive risk to [Plaintiffs'] health or safety." Id. at 619 (citing Vega v. Semple, 963 F.3d 259, 273 (2d Cir. 2020)).

Such personal involvement requires "direct participation, or failure to remedy the alleged wrong after learning of it, or creation of a policy or custom under which unconstitutional practices occurred[.]" Black v. Coughlin, 76 F.3d 72, 74 (2d Cir. 1996) (citing Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994)).

**C. Qualified Immunity**

The Supreme Court has held that "[g]overnment officials are entitled to qualified immunity [from liability] with respect to 'discretionary functions' performed in their official capacities." Ziglar v. Abbasi, 582 U.S. 120, 150 (2017) (quoting Anderson v. Creighton, 483 U.S. 635, 638 (1987)). Whether a government official can invoke qualified immunity "turns on the 'objective legal reasonableness' of the official's acts." Id. at 151 (quoting Harlow v. Fitzgerald, 457 U.S. 800, 819 (1982)). The reasonableness of the official's actions "must be 'assessed in light of the legal rules that were clearly established at the time [the action] was taken.'" Id. (quoting Creighton, 483 U.S. at 639).

To determine whether the official violated rights that were "clearly established," the Court "must ask whether it would have been clear to a reasonable officer that the alleged conduct was

unlawful in the situation he confronted." Id. at 151-52 (internal quotations and citations omitted). "[I]f a reasonable officer might not have known for certain that the conduct was unlawful[,] then the officer is immune from liability." Id. As the Supreme Court phrased differently in a previous case, the "right must be sufficiently clear that every reasonable official would have understood that what he [was] doing violate[d] that right." Taylor v. Barkes, 575 U.S. 822, 825 (2015) (internal quotations and citations omitted).

When confronted with the qualified immunity defense, the Court must determine the scope of the right that the plaintiff asserts was clearly established and that the official violated. There need not exist "a case directly on point" that addresses facts perfectly analogous to the instant case before the Court, "but existing precedent must have placed the statutory or constitutional question beyond debate." Id. (internal quotations and citations omitted). In other words, "the precise conduct at issue need not previously have been ruled unlawful" for the Court to conclude that the right was clearly established. Griffin v. Amatucci, 611 F. App'x 732, 734 (2d Cir. 2015) (summary order) (citing Zahrey v. Coffey, 221 F.3d 342, 357 (2d Cir. 2000)). As the Court of Appeals has noted in the specific context of claims of deliberate indifference in violation of the Eighth Amendment, assertions of qualified immunity "are not analyzed body-part by

14

body-part" or with "specificity as to the site and cause of pain[.]" Collymore v. Myers, 74 F.4th 22, 30 (2d Cir. 2023). Such a "restricted view of the right" alleged to have been violated would be unnecessarily narrow in determining whether the right was clearly established at the time of its alleged violation. See LaBounty v. Coughlin, 137 F.3d 68, 74 (2d Cir. 1998).

On the other hand, "the clearly established right must be defined with specificity," and the "dispositive question is whether the violative nature of particular conduct is clearly established." Vega, 963 F.3d at 275 (emphasis in original) (internal quotations and citations omitted). Accordingly, the Court must undertake this inquiry "in light of the specific context of the case, not as a broad general proposition." Id. In the context of claims for deliberate indifference, this means "'sufficiently serious' medical conditions 'should not be defined at a high level of generality.'" Collymore, 74 F.4th at 30 (quoting White v. Pauly, 580 U.S. 73, 79 (2017)).

**IV.  Discussion**

The Court will evaluate the eleven summary judgment motions by individual plaintiff.[5]

---

[5] Two of the motions seek to dismiss the claims asserted by Plaintiff Hernandez, one filed on behalf of State Represented Defendant Dr. Susan Mueller and one filed on behalf of Dr. Mantaro.

## A. Plaintiff Daniels' Claim for Deliberate Indifference

State Represented Defendant Dr. Susan Mueller moves for summary judgment to dismiss the claim against her brought by Plaintiff Daniels. (23-CV-5654, dkt. no. 14.)

Plaintiff Daniels received lower back and spinal fusion surgery in 2015. (Declaration of Ian Ramage, dated November 15, 2023 ("Ramage Decl.: Daniels") [23-CV-5654, dkt. no. 17], Ex. E (April 5, 2022 Deposition of Mark Daniels) [23-CV-5654, dkt. no. 17-5] ¶¶ 26:23-25.) Following additional back surgery (id. ¶¶ 49:3-18), Plaintiff Daniels was sent to multiple neurologists for consultation during 2017, (see Ramage Decl.: Daniels, Ex. J [23-CV-5654, dkt. no. 17-10] at MD 000406, 000390, 000384, 000381.) To manage his pain, Plaintiff Daniels was prescribed Neurontin as early as May 2012. (Report of Dr. Adam Carinci, dated May 8, 2022 ("Carinci Rpt." [19-CV-8173, dkt. nos. 348-362], dkt. no. 349-32 at 3.) His records also reflect failed treatment with Tramadol, Naproxen, Ultram, Flexeril, and physical therapy. (Id.)

Following an MRI, Dr. Joseph L. Racanelli on December 15, 2016, recommended that Plaintiff Daniels remain on Gabapentin. (Carinci Rpt., dkt. no. 349-35 at M Daniels 119-20.) On March 16, 2017, Plaintiff reported "neck, hands and back pain," "numbness," and the Gabapentin "hasn't helped at all, if anything it's worse." (Id. at M Daniels 122.) On April 14, 2017, Plaintiff refused

Neurontin, saying it was "making [him] sick." (Carinci Rpt., dkt. no. 349-36 at M Daniels 124.)

On June 8, 2017, a few days after the MWAP Policy was promulgated, Dr. Chung Lee at Shawangunk Correctional Facility submitted an MWAP request seeking approval for a continuing prescription of Neurontin. (Id. at M Daniels 129-32.) Defendant Mueller states that she reviewed Plaintiff's medical history on DOCCS' FHS1 computer system and learned that Plaintiff Daniels was still being treated by neurosurgery specialists following his spinal surgery. (See Declaration of Dr. Susan C. Mueller, dated November 15, 2023 ("Mueller Decl.: Daniels") [23-CV-5654, dkt. no. 16] ¶¶ 29-31.) Neurology specialists recommended that Plaintiff Daniels be prescribed Neurontin. (Id. ¶ 31.) Defendant Mueller approved Dr. Lee's request to continue Plaintiff Daniel's Neurontin, noting "no EMG. Will approve until EMG obtained for presumptive dx." (Carinci Rpt., dkt. no. 349-36 at M Daniels 136.)

Plaintiff Daniels complained that at some time between late July and September of 2017, his Neurontin was discontinued. (AC: Daniels ¶ 312.) Dr. Mueller states that she did not discontinue Plaintiff's Neurontin and that she was not notified that it had been discontinued. (Mueller Decl.: Daniels ¶¶ 38-39.) In his opposition to the motion, Plaintiff Daniels makes no mention of the 2017 MWAP request (see Pl. Opp'n at 25), so he has waived this claim.

17

On September 12, 2017, Dr. Lee began prescribing Cymbalta for Plaintiff Daniels.  (AC: Daniels ¶ 316.)  On December 13, 2018, Dr. Nicole Lostritto, an outside neurosurgeon, performed an electromyography (EMG) on Plaintiff noting that he was taking Cymbalta instead of Neurontin for his pain and recommended: "In addition to his Cymbalta, Baclofen could be trialed to help address his spasticity and modulate pain receptors."  (Carinci Rpt., dkt. no. 349-36 at M Daniels 144.)

Plaintiff also complains that an MWAP request submitted on March 12, 2018 by Dr. Lee for Lyrica was not approved by Dr. Mueller.  (See AC: Daniels ¶¶ 325-26; Ramage Decl.: Daniels, Ex. D [23-CV-5654, dkt. no. 17-4] at MD 00005-06).)  However, Dr. Mueller states that she never received this MWAP request and did not review it or disapprove it.  (Mueller Decl.: Daniels ¶¶ 41-42.)  Other than the March 12, 2018 MWAP request for Lyrica from Dr. Lee to Dr. Mueller (Carinci Rpt., dkt. no. 349-36 at M Daniels 147-48), the Court is unable to locate any emails or other correspondence from Dr. Lee to Dr. Mueller regarding the 2018 MWAP request for Lyrica or any entry in Plaintiff's medical record regarding this request.

With respect to the 2018 MWAP request, Plaintiff Daniels faults Dr. Mueller because Dr. Lee submitted the MWAP request for Lyrica to Dr. Mueller and Plaintiff never received the medication. (Pl. Opp'n at 25; see also Plaintiff's Response to Defendant's

Statement of Undisputed Facts and Plaintiff's Statement of Additional Material Facts Precluding Summary Judgment, dated January 5, 2023 ("PSUF: Daniels") [23-CV-5654, dkt. no. 28] ¶ 105.) While this might indeed be true, as noted above, there is no evidence in the record to support any personal involvement by Dr. Mueller in the 2018 MWAP request. Plaintiff Daniels testified that his Lyrica request was denied by "Albany." (Ramage Decl.: Daniels, Ex. E ¶¶ 146:4-5.) However, he also testified, "I can't say whose decision it was. I just know that I didn't get it." (Id. ¶¶ 147:5-6.) That Dr. Mueller was the assigned RMD at the time is insufficient as a basis for finding any personal involvement on her part. In addition, it is insufficient as a basis for any subjective intent on the part of Dr. Mueller. Accordingly, Dr. Mueller's motion for summary judgment as to Plaintiff Daniels' claim of deliberate indifference (23-CV-5654, dkt. no. 14) is granted.

## B. Plaintiff Dickinson's Claim for Deliberate Indifference

State Represented Defendant Dr. Susan Mueller moves for summary judgment to dismiss the claim against her brought by Plaintiff Dickinson. (23-CV-5654, dkt. no. 14.)

As Dr. Carinci related:

Mr. Dickinson arrived at DOCCS on November 15, 2016 []. X-rays taken on December 20, 2016 showed mild spondylosis at C6-7 of his cervical spine with bullet fragments and impingement in his right shoulder. [] An x-ray of Mr. Dickinson's left hip taken on March 30,

2017 showed mild degenerative joint disease which was
more prominent in his left than right hip. [] On December
19, 2016, DOCCS transferred Mr. Dickinson to Shawangunk
Correctional Facility.  Dr. Chung Lee was assigned as
his medical provider.  The records are not clear, but it
seems that Dr. Lee continued Mr. Dickinson's Baclofen
and Ultram prescriptions and changed Lyrica to Neurontin
600 mg twice a day. [] Mr. Dickinson began physical
therapy on May 24, 2017 to address his shoulder
impingement. [] Dr. Ehab Essa, the physical therapist,
reported that he tolerated the session well but reported
that he suffered from back pain.

(Carinci Rpt., dkt. no. 350-8 at 3.)

Plaintiff Dickinson's pain had been managed successfully with
Ultram, Flexeril, Lyrica, and Baclofen since at least 2012. (Id.)
Following MWAP, all Plaintiff Dickinson's medications were
discontinued. A June 19, 2017 EMG study showed Plaintiff Dickinson
suffered from abnormal motor and sensory responses and with
sensorimotor neuropathy. (Carinci Rpt., dkt. no. 350-9 at S.
Dickinson 077-80.) Dr. Lee submitted two MWAP requests for Ultram
and Baclofen. (Id. at S. Dickinson 082-88.)  In denying the MWAP
requests for Baclofen, Dr. Mueller merely stated, "please see
policy regarding use of muscle relaxants." (Id. at S. Dickinson
085.)  With respect to the Ultram request, she questioned how
Plaintiff Dickinson's gunshot wound from 1990 and resulting
paraplegia would cause pain and recommended pain management. (Id.
at S. Dickinson 088.)

In her declaration, however, Dr. Mueller stated essentially
that Plaintiff Dickinson had not undergone any diagnostic testing

and that in her medical judgment "Baclofen[] is not effective for treating muscle spasms." (Declaration of Dr. Susan C. Mueller, dated November 15, 2023 ("Mueller Decl.: Dickinson") [23-CV-5657, dkt. no. 16] ¶ 26.) She also opined that in her medical judgment "the requested prescription for Ultram was not appropriate due to an absence of any indication or complaint of pain by Plaintiff." (Id. ¶ 41.) Dr. Mueller added that she did not approve the request for Ultram because she "did not know what pain the requested medication would be treating, as Plaintiff is insensate." (Id. ¶ 42.)

On August 8, 2017, Dr. Lee submitted an MWAP request for Neurontin to treat "spinal cord [injury], [due to gunshot wound,] paraplegia, sensorimotor neuropathy" with eleven refills. (Carinci Rpt., dkt. no. 350-10 at S. Dickinson 104-06.) In her response to the MWAP request, Dr. Mueller cited no patient-specific information but merely instructed Dr. Lee to find safer alternatives. (Id. at S. Dickinson 106.) Dr. Mueller approved only a 30-day prescription for Neurontin. (Id.)

In her declaration, however, Dr. Mueller stated that "the potential risks of long-term treatment with Neurontin are such that there are safer treatment strategies and medications that should first be tried to manage Plaintiff's neuropathy." (Mueller Decl.: Dickinson ¶ 51.)

21

On August 9, 2017, Plaintiff Dickinson saw a neurologist, Dr. Matthew Murnane, who noted that Lyrica had helped Plaintiff's pain and that Plaintiff Dickinson was then "put on a low dose of [Neurontin] but it was stopped for unclear reasons and higher dose not tried." (Carinci Rpt., dkt. no. 350-8 at 3; Carinci Rpt., dkt. no. 350-10 at S. Dickinson 107.)  Dr. Murnane recommended that Plaintiff Dickinson try Elavil but if it failed, to retry Neurontin at a higher dose and increase Baclofen. (Carinci Rpt., dkt. no. 350-8 at 3; Carinci Rpt., dkt. no. 350-10 at S. Dickinson 107-10.)  In light of the expert's recommendation, Dr. Lee submitted another MWAP request on August 15, 2017 for Baclofen and Neurontin. (Carinci Rpt., dkt. no. 350-10 at S. Dickinson 112-119.)  In her response denying the MWAP, Dr. Mueller again referred to the muscle relaxant policy and the MWAP policy. (Carinci Rpt., dkt. no. 350-8 at 3; Carinci Rpt., dkt. no. 350-10 at S. Dickinson 114.)  In her declaration, Dr. Mueller states that in her medical training and experience, Baclofen is "not effective for treating muscle spasms and is instead used to treat muscle spasticity." (Mueller Decl.: Dickinson ¶ 60.)  Thus, she found the prescription for Baclofen inappropriate.  (Id. ¶ 64.)

Consistent with the expert's recommendation, Dr. Lee then tried Elavil but discontinued it two weeks later because Plaintiff Dickinson stated it made him excessively sleepy and was not effective for his pain.  (Carinci Rpt., dkt. no. 350-8 at 4;

Carinci Rpt., dkt. no. 350-10 at S. Dickinson 125-30.)    On September 27, 2017, Dr. Lee made another MWAP request for Neurontin which Dr. Mueller denied (Carinci Rpt., dkt. no. 350-8 at 4; Carinci Rpt., dkt. no. 350-10 at S. Dickinson 134-36), directing Dr. Lee "to the televideo and handouts from 8/17/17" (Carinci Rpt., dkt. no. 350-8 at 4; Carinci Rpt., dkt. no. 350-10 at 136).

In her declaration, however, Dr. Mueller stated that "in my medical judgment, Plaintiff would benefit in the long run from safer medical alternatives to Neurontin." (Mueller Decl.: Dickinson ¶ 73.)

Based on the record before the Court, there is a question of fact as to whether Dr. Mueller exercised her medical judgment in denying the MWAP requests—as she stated in her post-litigation declaration—or whether she relied reflexively on the MWAP policies—as stated in her denials of the MWAP requests.  As in Ippolito v. Goord, a jury could find that Dr. Mueller acted with deliberate indifference by "reflexively rely[ing] on the purported [medical] soundness of the [MWAP policy] itself, even where [she was] on notice" by Plaintiff's past successful treatment with MWAP medications and the recommendation of outside experts and prison doctors "that a departure [from the MWAP policy] might be medically appropriate."  No. 05-CV-6683, 2012 WL 4210125, at *13 (W.D.N.Y. Sept. 19, 2012) (internal quotations omitted); see also Johnson, 412 F.3d at 406.  Accordingly, Dr. Mueller's motion for summary

23

judgment as to Plaintiff Dickinson's claim for deliberate indifference (23-CV-5657, dkt. no. 14) is denied.

### C. Plaintiff Dockery's Claim for Deliberate Indifference

State Represented Defendants Drs. Susan Mueller, John Hammer, David Dinello, and NP Kristin Salotti move for summary judgment to dismiss the claims against them brought by Plaintiff Dockery. (23-CV-5658, dkt. no. 22.) As set out at length in Dr. Carinci's expert report, Plaintiff was diagnosed with Multiple Sclerosis ("MS") in 2016 while in DOCCS custody. (Carinci Rpt., dkt. no. 351-1 at 3-8.) MRIs confirmed the findings, and various expert neurologists recommended treatment with MWAP medications. (See id.)

Plaintiff Dockery complains about NP Salotti but did not respond to her motion for summary judgment. (See Pl. Opp'n at 28-31.) Accordingly, the claims against NP Salotti are deemed abandoned, and she is entitled to judgment.

With respect to Dr. Hammer, Plaintiff Dockery concedes that Dr. Hammer spoke to Plaintiff's provider, Dr. Gusman, and approved the provider's prescription for Neurontin for ten days, albeit with a change in dosage. (Plaintiff's Response to Defendant's Statements of Undisputed Facts and Plaintiff's Statement of Additional Material Facts Precluding Summary Judgment, dated January 5, 2023 ("PSUF: Dockery") [23-CV-5658, dkt. no. 43] at 22-23.) As Dr. Hammer explained in his Declaration, he reviewed the

MWAP request for ten days of Neurontin 900 mg bid and discussed Plaintiff Dockery with Dr. Gusman, Plaintiff's new provider at Shawangunk Correctional Facility. (Declaration of Dr. John Hammer ("Hammer Decl: Dockery") [23-CV-5658, dkt. no. 25] ¶¶ 17-28.) Dr. Hammer noted that the discharge order from Albany Medical Center the prior month recommended Neurontin 900 mg in the a.m. and 1800 mg qHS and that Dr. Gusman stated that "he intended to investigate and possibly adjust the dosage given to Plaintiff after this ten-day period." (Id. ¶ 19.) Dr. Hammer also noted that the dosage recommend by Albany Medical Center was unusual. (Id. ¶¶ 22-26.) Accordingly, Dr. Hammer approved the MWAP request for 10 days of Neurontin 900 mg, bid, "to ensure continuity of care for this patient." (Id. ¶ 21.) On this record, no jury could find Dr. Hammer to have been deliberately indifferent to Plaintiff Dockery's needs. Accordingly, Dr. Hammer is entitled to judgment.

With respect to Dr. Mueller, Plaintiff Dockery complains that she denied Dr. Lee's August 8, 2018 MWAP request for Neurontin. (Amended Complaint as Severed from Allen I, filed June 30, 2023 ("AC: Dockery") ¶¶ 328-29.) In his MWAP request, Dr. Lee noted:

> Offender was transferred from COX infirmary RMU. Was consulted to Dr. Koenigman [sic] for [N]eurontin & approved. [MRI] confirmed presence of multiple subcortical white matter lesions. Neurontin discontinued on 7-2018. [N]ow, offender can't sleep x several days, d/t pain & hands/foot neuropathy, used walker for ambulatory, used to walk without walker, tried w/[E]lavil, [T]egretol, [S]ymbalta not effective.

(Declaration of Michael J. Keane, filed November 15, 2023 ("Keane
Decl.: Dockery") [23-CV-5658, dkt. no. 29], Ex. X [23-CV-5658,
dkt. no. 29-24] at 2.)  Dr. Mueller denied the request stating:

> Does not have EMG diagnostic of peripheral neuropathy.
> Has recent Tier 3 convictions for drug use most recently
> as 7/20/18.  According to medical staff does not appear
> to be in pain, but rather malingering and drug seeking,
> strongly muscled.  Started bringing walker to medical
> unit after Neurontin stopped last month.  For how long
> and what dates were above-noted medications used?  Need
> supportive diagnostics.  Suggest alternative safer
> treatment modalities for this patient who is presently
> abusing illicit drugs.

(Id. at 3.)

Had Dr. Mueller actually reviewed Plaintiff Dockery's medical
records, she would have seen that:

1) His 2016 MRIs showed brain lesions and a demyelinating process
   (Carinci Rpt., dkt. no. 351-1 at 1; see also id. at A Dockery
   001-04);

2) Consulting neurologist Antonio Culebras suggested Neurontin
   (id. at 3);

3) DOCCS providers treated Plaintiff with Neurontin (id. at 3);

4) Plaintiff's June 17, 2017, MRI showed similar demyelinating
   features (id.; see also id. at A Dockery 011);

5) On June 20, 2017, Plaintiff reported "symptoms worsening"
   with the warmer weather and thus requested an increase in his
   Neurontin or a change in medication (id. at 3; see also id.
   at A Dockery 012);

6) Following the promulgation of MWAP policy, Plaintiff's Neurontin was ordered tapered on June 20, 2017 (id. at 3; see also id. at A Dockery 012);

7) On July 28, 2017, Plaintiff was admitted to the infirmary at Coxsackie due to his MS symptoms (id. at 3);

8) Dr. Kathleen Mantaro submitted an MWAP request for Neurontin which Dr. Mueller approved for 30 days (id.; see also id. at A Dockery 022-24);

9) Neurology consultant Dr. Eric Molho suggested that Plaintiff's Neurontin be increased because of worsening symptoms (Carinci Rept., dkt. no. 351-2, at 3; id. at Dockery 029), for which Dr. Miller submitted an MWAP request which was denied by Dr. Dinello on September 15, 2017 (id. at 3; id. at A Dockery 030-35);

10)   On September 21, 2017, upon discharge from the Albany Medical Center emergency room, the attending physician wrote:

> Diagnostic Impression.
> Seems as if the patient's symptoms began to increase as the patient's Gabapentin was taken off. I do believe that the symptoms are directly related to the fact that the patient is no longer Gabapentin [sic], and I do believe it is medically necessary for the patient to receive this medication as prescribed by his neurologist.  I did speak with the deputy superintendent of the jail who told me that [G]abapentin has been taken off of all inmates in this region and that this patient was deemed to not require it by the regional medication director. . . .  I recommend that [G]abapentin is restarted at 600mg twice a day and that the patient see the

> facility neurologist in the next week for
> discussion regarding dosage.

(Carinci Rpt., dkt. no. 351-2 at A Dockery 044.)  Drs.
Miller and Mantaro submitted an MWAP request for Neurontin
citing Plaintiff's emergency room visit and neurology
recommendations (id. at A Dockery 045A-48), but Dr. Mueller
denied the request, suggesting Lyrica instead (Carinci
Rpt., dkt. no. 351-3 at A Dockery 053);

11)   Plaintiff grieved these issues (Carinci Rpt., dkt. no.
      350-1 at 4), and when Dr. Miller submitted an MWAP request
      directly to Chief Medical Officer ("CMO") Karl Koenigsmann
      for Neurontin, Dr. Koenigsmann approved a 30-day supply
      (Carinci Rpt., dkt. no. 351-3 at A Dockery 065-68);

12)   On January 11, 2018, Plaintiff was admitted to Albany
      Medical Center with an MS flare-up and was treated with
      Neurontin and a short term of Ultram (Carinci Rpt., dkt. no.
      351-1 at 4);

13)   On January 17, 2018, Plaintiff was discharged to
      Coxsackie with orders for Neurontin, among other
      medications, some of which were tried, but Plaintiff still
      had trouble walking (id. at 4-5);

14)   In February of 2018, upon transfer to Shawangunk
      Correction Facility, provider Dr. Gusman prescribed a five-
      day emergency supply of Neurontin and submitted an MWAP for

28

Neurontin which was approved by RMD Hammer for ten days (id. at 5; Carinci Rpt., dkt. no. 351-4 at A Dockery 106-08 ¶¶ 30-32);

15)    After eight days in the infirmary, provider Dr. Lee submitted an MWAP request for Neurontin explaining that all outside neurologists had approved this treatment which had indeed worked to prevent flare-ups.  (Carinci Rpt., dkt. no. 351-5 at A Dockery 112-13.)  Dr. Mueller suggested sending this request to Dr. Koenigsmann (id. at A Dockery 115), who approved it with a dosing change (id. at A Dockery 119-20);

16)    On February 18, 2018, Plaintiff saw neurologist Octavian Adam who recommended an increase in Plaintiff's Neurontin.  (Id. at A Dockery 122.)  While the increase was not effectuated, when Plaintiff's Neurontin prescription was set to run out, Dr. Lee submitted another MWAP request for it to Dr. Mueller who did not approve it, citing "nothing supporting use of Neurontin" (id. at A Dockery 129-31);

17)    Plaintiff grieved this denial arguing that he had already suffered traumatic flare-ups as a result of being taken off this medication (id. at A Dockery 133);

18)    Upon discontinuation of Neurontin, Plaintiff Dockery began experiencing severe pain and discomfort, and on

August 10, 2018, Dr. Lee submitted yet another MWAP request

for Neurontin which Dr. Mueller denied, omitting any

mention of Plaintiff's MS (<u>id.</u> at A Dockery 135-37);

19)    In December of 2018, Plaintiff Dockery's MRI revealed

new "brain lesions and progression of his MS," but he was

still not being treated for his pain and symptoms (Carinci

Rpt., dkt. no. 351-1 at 5-6).

Based on this record, there is a question of fact as to

whether Dr. Mueller exercised her judgment in denying the MWAP

request or whether she relied reflexively on the MWAP policy.

While it is true that Plaintiff Dockery received a disciplinary

ticket on July 20, 2018 for smoking marijuana (<u>id.</u> at 3), all of

the outside specialists and the DOCCS providers treating Plaintiff

recommended Neurontin, and Neurontin had proved effective in

treating Plaintiff's symptoms.  As in <u>Ippolito</u>, a jury could find

that Dr. Mueller acted with deliberate indifference by

"reflexively rely[ing] on the purported [medical] soundness of the

[MWAP policy] itself, even where [she was] on notice" by

Plaintiff's past successful treatment with MWAP medications and

the recommendation of outside experts and prison doctors "that a

departure [from the MWAP policy] might be medically appropriate."

2012 WL 4210125, at *13 (internal quotations omitted); <u>see also</u>

<u>Johnson</u>, 412 F.3d at 406.  Accordingly, Dr. Mueller's motion for

summary judgment as to Plaintiff Dockery's claim for deliberate indifference (23-CV-5658, dkt. no. 22) is denied.

With respect to Dr. Dinello, Plaintiff Dockery complains that the doctor refused to approve his Neurontin prescription on September 14, 2017. (AC: Dockery ¶ 294.) In so doing, Dr. Dinello stated "the [Neurontin] has not been approved as there is insufficient medical justification to continue its use. Please see the MWAP Request Form for additional information." (Keane Decl.: Dockery, Ex. Q [23-CV-5658, dkt. no. 29-17] at Aaron Dockery 031.) In his declaration, however, Dr. Dinello states:

> I did see some support for the use of Neurontin in the records I reviewed for this patient. Specifically, it appeared that a neurologist had recommended Neurontin for reported episodes of trigeminal irritation in 2016. However, it appeared that no diagnostic tests had been performed to determine the cause or extent of the neuropathy. There were safer pain medications that did not appear to have been tried. The most recent recommendation from a neurologist was to treat with either Tegratol, which Dr. Miller reported had not been effective and was causing unacceptable side effects, or Lyrica, which did not appear to have been tried. And crucially to my mind, the medical records indicated that the patient had recently reported that 600 mg of Neurontin bid, as requested in the MWAP request, was NOT effective in controlling his pain.

(Declaration of Dr. David S. Dinello ("Dinello Decl.: Dockery") [23-CV-5658, dkt. no. 24] ¶ 29.)

With respect to Dr. Dinello's report that Plaintiff stated the Neurontin was not effective in controlling his pain, the actual medical record entry states "requesting an [increase] in Neurontin

or [change] to a different [medication] 'since weather is getting more hot, symptoms are worsening.'" (Keane Decl.: Dockery, Ex. I [23-CV-5658, dkt. no. 29-9].) Thus, the entry does not indicate that Neurontin was not effective, as it had been shown to be throughout Plaintiff Dockery's medical records, but rather that with the hot weather that Plaintiff's symptoms were worsening.

Similarly, had Dr. Dinello actually reviewed Plaintiff Dockery's medical records, he would have seen the same items noted above for Dr. Mueller. Thus, the same result obtains as in Ippolito: a jury could find that Dr. Dinello acted with deliberate indifference by "reflexively rely[ing] on the purported [medical] soundness of the [MWAP policy] itself, even where [Defendant was] on notice" by Plaintiff's past successful treatment with MWAP medications and the recommendation of outside experts and prison doctors "that a departure [from the MWAP policy] might be medically appropriate." 2012 WL 4210125, at *13 (internal quotations omitted); see also Johnson, 412 F.3d at 406. Accordingly, Dr. Dinello's motion for summary judgment as to Plaintiff Dockery's claim for deliberate indifference (23-CV-5658, dkt. no. 22) is denied.

### D. Plaintiff Gradia's Claim for Deliberate Indifference

State Represented Defendants Drs. Hammer, Dinello, and Mueller move for summary judgment to dismiss the claims against them by Plaintiff Gradia. (23-CV-5660, dkt. no. 18.) At the relevant times, Dr. Mueller was the RMD assigned to the hub that

included Eastern Correctional Facility, where Plaintiff Gradia was housed, and Drs. Hammer and Dinello were RMDs assigned to other hubs.  (See SRD 56.1 Stmt.: Gradia ¶ 1; Memorandum of Law in Support of State Represented Defendants' Motion for Summary Judgment, dated November 16, 2023 ("SRD MSJ Br.: Gradia") [23-CV-5660, dkt. no. 25] at 12; Declaration of Dr. John Hammer ("Hammer Decl.: Gradia"), dated May 20, 2021 [23-CV-5660, dkt. no. 19] ¶¶ 17-19; Declaration of Dr. David S. Dinello, dated May 20, 2021 ("Dinello Decl.: Gradia") [23-CV-5660, dkt. no. 20] ¶ 28.)

Although the Amended Complaint complains of the denial of pain medications on a variety of dates (see, e.g., Amended Complaint as Severed from Allen I, filed June 30, 2023 ("AC: Gradia") [23-CV-5660, dkt. no. 1] ¶¶ 272-367), Plaintiff's Amended Memorandum of Law in Opposition to the motion for summary judgment only discusses two denials (see Pl. Opp'n at 32-33).  Accordingly, the Court will limit its discussion to those.

As set out by Dr. Carinci, "John Gradia is 51 years old and . . . has a long history of physical ailments ranging from recurrent prostatitis to serious degenerative lumbar disc disease, degenerative joint disease in the right knee."  (Carinci Rpt., dkt. no. 352-7 at 3.)  Beginning in April of 2013, Plaintiff complained of "severe lower back, groin, rectum, and testicular pain" that prevented him from sleeping.  (Id.)  In the April to June time period, he was treated with, inter alia, Percocet and

Ultram, the latter on the recommendation of Dr. Thomas Stellato, a urology specialist. (Id.) Plaintiff Gradia continued to complain of severe pain, including in an October 21, 2013, formal grievance asking that he be afforded "appropriate pain medication whereas I do not have to suffer in pain every day." (Id. at 3-4 (citing id. at J. Gradia 37).)

A January 22, 2014 lumbar spine X-ray was performed which, when compared to Plaintiff's 2007 X-ray, confirmed that "considerable disease in Mr. Gradia's spine had progressed." (Id. at 4 (citing id. at J. Gradia 50-51).) A March 4 MRI also reflected "significant findings," and a neurologist recommended that Plaintiff Gradia be prescribed Neurontin, which he took with occasional varying effects. (Id.)

X-rays and MRIs in June and July of 2015 again "confirmed significant disease in [Plaintiff's] spine," and he received three expert opinions on a surgical option. (Id. at 5.) On February 26, 2016, Plaintiff Gradia underwent anterior lumbar interbody fusion surgery and was given Ultram, Neurontin, and Motrin for pain management. (Id.) In March of 2016, Provider Dr. Andola's request for a twelve-month prescription for Neurontin was approved. (Id. (citing Carinci Rpt., dkt. no. 352-9 at J. Gradia 114-115).) An April 25, 2016 MRI found a "new left lateral disc herniation at L4-5 . . . ." (Id. at 6 (citing Carinci Rpt., dkt. no. 352-9 at J. Gradia 132-33).) On May 6, 2016, Plaintiff noted

34

that his medication was not working and asked for an increase of
his Neurontin. (Id. (citing Carinci Rpt., dkt. no. 352-9 at J.
Gradia 134).) An EMG conducted by Dr. George Forrest on May 13,
2016, "suggest[ed] chronic multi-level root irritation." (Id.
(citing Carinci Rpt., dkt. no. 352-9 at J. Gradia 135-36).)
Plaintiff was treated with Neurontin and Percocet in June and July
2016; the Percocet was decreased in August, and Plaintiff Gradia
filed a grievance relating to his pain in September of 2016 where
he requested "[t]o be administered the appropriate amount of pain
medication that I was on to alleviate the constant pain I have to
suffer . . . ." (Id.; Carinci Rpt., dkt. no. 352-10 at J. Gradia
165.) The September 2016 pain therapy consultant recommended
continuing Neurontin but increasing Percocet; the latter
recommendation was not approved. (Carinci Rpt., dkt. no. 352-7 at
6.)

As Dr. Carinci relates:

On March 1, 2017, Mr. Gradia received a nerve block and
epidural block injection under fluoroscopy at Harris
Anesthesia. [] Harris Anesthesia requested he be given
post-operative medication for two weeks until the block
takes full effect. [] A day later, he reported sharp
pain like "someone sticking a knife in my rectum and
twisting it." [] Mr. Gradia's Treatment and Medication
Chart indicates that his pain medication was not
adjusted as recommended by the specialist and he
continued to receive the same dosage of Neurontin (TID)
and single dose of Percocet a day. [] As Mr. Gradia's
pain continued to persist, on April 13, 2017 he met with
Dr. DiRisio again who recommended an injection at L5-S1
to see if his problem is higher up his spine. [] On April
28, 2017 he was back at Harris Anesthesia for a pain

35

> management consultation where it was suggested his
> Neurontin be increased from 900mg to 1200mg and that he
> be scheduled for nerve root injections to L3-4 and L4-
> 5. [] On May 19, 2017 Dr. Andola examined Mr. Gradia and
> noted worsening symptoms in his back, anus, scrotum,
> inner thigh, with chronic burning numbness. [] She noted
> that he had to stand for three hours during the night
> because the pain was worse when he laid down. [] Dr.
> Andola prescribed the maximum dose of Neurontin (1200mg)
> and increased his Percocet dosage to BID for two weeks.

(Id. at 6-7.)

On June 1, 2017, the MWAP Policy was promulgated, at which time Plaintiff Gradia was treated with Neurontin and Percocet. (Id. at 7.) On June 7, 2017, Dr. Andola submitted an MWAP request to renew Plaintiff's Percocet prescription for five days which, after some back and forth, was denied by Dr. Mueller. (Id. (citing Carinci Rpt., dkt. no. 352-11 at J. Gradia at 213-14, 217, 220).) Dr. Hammer responded noting that "Dr. Mueller [the assigned RMD] is out today. Was this an informational email or do you require some assistance with this case?" (Carinci Rpt., dkt. no. 352-11 at J. Gradia 219.) Dr. Hammer states, without contradiction, that he had no involvement with the June 2017 Percocet MWAP request other than that response. (Hammer Decl.: Gradia ¶¶ 16-21.)

On June 16, 2017, Plaintiff Gradia is recorded as telling a nurse "I don't know why I'm suffering with all this pain when it was recommended by 'pain management' that I receive my pain medications for two weeks [after] this injection." (Carinci Rpt.,

36

dkt. no. 352-7 at 7; Carinci Rpt., dkt. no. 352-11 at J. Gradia 230.)

The first denial at issue in Plaintiff's Opposition is the June 23, 2017 MWAP request submitted by Dr. Andola to renew Plaintiff's Neurontin prescription for a year, noting his surgery and that he was currently on Neurontin (Gabapentin).  (Pl. Opp'n at 32; Carinci Rpt., dkt. no. 352-11 at J. Gradia 241-244.)  Dr. Mueller denied the twelve-month request and only approved thirty days with two refills.  (Carinci Rpt., dkt. no. 352-11 at J. Gradia 244.)  In her Declaration, Dr. Mueller cites no patient-specific reason for this denial (Declaration of Dr. Susan C. Mueller, dated November 13, 2023 ("Mueller Decl.: Gradia") [23-CV-5660, dkt. no. 21] ¶¶ 37-41), and indeed cited no reason for the denial on the MWAP (see Carinci Rpt., dkt. no. 352-11 at J. Gradia 244).

As Dr. Carinci reports:

On July 21, 2017 Mr. Gradia returned to Harris Anesthesia for pain therapy consultation and was recommended for injection treatment every 14 days, Ultram 100mg TID, and follow-up appointment with neurosurgery. [] These recommendations were entered into his AHR on the same day and noted "agree . . . on injection every 14 days." [] On or around August 25, 2017 Dr. Andola submitted a MWAP request for a one-month duration of Ultram. [] Dr. Andola specified that the request followed the 7/21/17 pain management consultation recommendation to treat Mr. Gradia's pain. [] Dr. Andola further documented in the MWAP request form the specialist recommendation of Neurontin and Percocet (which was previously denied) be prescribed for his pain management and identified past treatments attempted of Ibuprofen and Tylenol #3. [] RMD Mueller did not approve the request stating an MRI finding was not clinically significant, that he never

> had PT for his lower back pain and recommended to "explore safer alternatives as well as continue Pain Management."

(Carinci Rpt., dkt. no. 352-7 at 7; see also Carinci Rpt., dkt. no. 352-11 at J. Gradia 250; Carinci Rpt., dkt. no. 352-12 at J. Gradia 252-54 (MWAP request forms).)

Dr. Dinello also emailed his denial of the MWAP request stating that there was insufficient medical justification for the medication. (Carinci Rpt., dkt. no. 352-12 at J. Gradia 256.)

As in Ippolito, a jury could find that Dr. Mueller and Dr. Dinello acted with deliberate indifference by "reflexively rely[ing] on the purported [medical] soundness of the [MWAP policy] itself, even where they [were] on notice" by Plaintiff's past successful treatment with MWAP medications and the recommendation of outside experts and prison doctors "that a departure [from the MWAP policy] might be medically appropriate." 2012 WL 4210125, at *13 (internal quotations omitted); see also Johnson, 412 F.3d at 406. Accordingly, Dr. Mueller and Dr. Dinello's motion for summary judgment as to Plaintiff Gradia's claim of deliberate indifference (23-CV-5660, dkt. no. 18) is denied.

As noted above, Dr. Hammer had no involvement with either of the complained of MWAP denials (see Hammer Decl.: Gradia ¶¶ 16-21), and thus is entitled to summary judgment.

**E. Plaintiff Hernandez's Claim for Deliberate Indifference**

Dr. Kathleen Mantaro (23-CV-5661, dkt. no. 24) and State Represented Defendant Dr. Susan Mueller (23-CV-5661, dkt. no. 29) move for summary judgment to dismiss the claims against them by Plaintiff Hernandez.

As reported by Dr. Carinci:

> Angel Hernandez is a 58-year-old patient who suffers from various physical maladies including back pain with radiating symptoms to the left side of his body. He is currently in the custody of DOCCS and residing in Wallkill Correctional Facility. He is documented to be suffering from degenerative disc disease at his L5-S1, osteoarthritis, and left carpal tunnel syndrome with numbness and neuropathy. His medical problem list includes pain management, cervical spine syndromes, back pain with radiating symptoms. [] Mr. Hernandez has a history of gunshot wounds and related surgeries to his left arm, as well as a remote history of opioid abuse before his incarceration in 2000. [] His medical records show well documented and longstanding chronic pain ailments that require consistent pain management intervention to control.

(Carinci Rpt., dkt. no. 352-30 at 3.)

Dr. Kathleen Mantaro, Plaintiff Hernandez's provider at Coxsackie, reports that when she began treatment, Plaintiff had prescriptions for Ultram and Neurontin, prescribed by Dr. Miller. (Declaration of Kathleen Mantaro ("Mantaro Decl: Hernandez") [23-CV-5661, dkt. no. 27] ¶ 9.) As she reports, on January 24, 2017, Plaintiff Hernandez reported left arm numbness, that he had previously had an MRI on the lower spine, and needed an EMG. Dr. Mantaro ordered an EMG and renewed his Ultram prescription. (Id.

¶ 10 (citing Ex. A [23-CV-5661, dkt. no. 27-1] at Mantaro-001).)
She noted that the December 12, 2016 MRI of Plaintiff Hernandez's
lower spine showed "diffuse degenerative changes without focal
abnormality."    (Id. ¶ 11 (citing Ex. A at Mantaro-002).)
Plaintiff's EMG on March 3, 2017, reported normal.    (Id. ¶ 12
(citing Ex. A at Mantaro-004-05).)    On March 13, 2017, Plaintiff
Hernandez complained of back pain, and Dr. Mantaro ordered several
referrals and prescribed Flexeril.    (Id. ¶ 13 (citing Ex. A at
Mantaro-003).)    Dr. Mantaro referred Plaintiff for a surgery
consultation, and Dr. Chismark, the surgeon, recommended Celebrex
and consideration of Neurontin, which Dr. Mantaro ordered.    (Id.
¶ 14 (citing Ex. A at Mantaro-006-07).)

        On May 1, 2017, Plaintiff Hernandez complained of shoulder
pain, and Dr. Mantaro referred him for an MRI and an orthopedic
consultation; those requests were denied by Dr. Mueller.    (Id.
¶ 15 (citing Ex. A at Mantaro-008-11).)    Following a pain therapy
consultation on March 15, 2017, Dr. Azam, the pain expert,
recommended an increase in Neurontin, among other things.    (Id.
¶ 16 (citing Ex. A at Mantaro-012).)    Because she agreed with Dr.
Azam's recommendation, Dr. Mantaro ordered an increase in
Plaintiff Hernandez's Neurontin and further increased his Ultram
and Neurontin on May 24, 2017 in response to continued complaints
of shoulder and lower back pain.    (Id. ¶¶ 16-17 (citing Ex. A at

Mantaro-012-15).)  She also ordered an MRI and physical therapy referral.  (Id. ¶ 18 (citing Ex. A at Mantaro-013, 015-16).)

The MWAP policy was promulgated on June 1, 2017.  (Id. ¶ 19.)

At a follow-up appointment on June 15, 2017, Dr. Azam recommended continuing Neurontin, among other things.  (Id. ¶ 20 (citing Ex. A at Mantaro-017).)  Dr. Mantaro agreed with Dr. Azam's recommendations and, on June 27, 2017, ordered increases in his Ultram and Neurontin prescriptions.  (Id. ¶ 21 (citing Ex. A at Mantaro-027, 018).)

On June 26, 2017, Dr. Miller, another provider, submitted an MWAP request for renewal of Plaintiff Hernandez's Neurontin prescription.  (Id. ¶ 22 (citing Mantaro-019, 021).)  Dr. Mueller denied the request, noting "no EMG or mention of 5 pt. sensory exam diagnostic of peripheral neuropathy" and suggesting utilizing "safer agents."  (Id.; Ex. A at Mantaro-019-21.)

Dr. Miller also submitted an MWAP request to renew Plaintiff Hernandez's Ultram prescription.  That request was similarly denied by Dr. Mueller.  (Id. ¶ 23 (citing Ex. A at Mantaro-022-24).)  In denying the request, Dr. Mueller stated: "Has not had PT for LBP since 2014.  Past success with steroid injections.  Recommend PT for back, counseling to accept recommended interventional pain procedures."  (Ex. A at Mantaro-024.)  Very shortly after that, Dr. Dinello agreed with the denial and ordered that Plaintiff be weaned off of Ultram.  (Declaration of Kathleeen

41

Mantaro, dated November 11, 2023 ("Mantaro Decl.: Hernandez")
[23-CV-5661, dkt. no. 27] ¶ 23 (citing Ex. A [23-CV-5661, dkt. no.
27-1] at Mantaro-025).)

On June 27, 2017, Dr. Mantaro adjusted Plaintiff's Ultram and
Neurontin prescriptions, and on June 29 noted that Ultram was not
approved and needed to be tapered.  (Id. ¶ 25 (citing Ex. A at
Mantaro-027); Ex. A at Mantaro-029.)  On July 18, 2017, Dr. Mantaro
ordered Plaintiff a Transcutaneous Electrical Nerve Stimulation
("TENS") unit to assist with his back pain and referred him to a
follow up with Dr. Mueller. (Mantaro Decl.: Hernandez ¶ 26 (citing
Ex. A at Mantaro-030).)  Finally, on August 2, 2017, at the
instruction of Drs. Mueller and Dinello, Dr. Mantaro ordered taper
schedules of Plaintiff Hernandez's Ultram and Neurontin.  (Id.
¶ 27 (citing Ex. A at Mantaro-031-032).)  Dr. Mantaro departed
DOCCS on or about August 4, 2017.  (Id. ¶ 28.)

Plaintiff faults Dr. Mantaro for not appealing the denials to
the CMO or RMD with additional information and for not prescribing
alternative medications. (Pl. Opp'n at 34.) However, Dr. Mantaro
explained:

> I had no ability to fill these prescriptions without
> approval.  The MWAP policy did not have an appeal
> mechanism and my understanding was there were no other
> options after a non-approval but to follow the
> recommendations made by my clinical supervisor Dr. Susan
> Mueller and Dr. Dinello.

(Mantaro Decl.: Hernandez ¶ 24.)  There is no evidence to the contrary in the record.

Because Dr. Mantaro was entirely responsive to Plaintiff Hernandez's pain complaints, including prescribing medications recommended by surgery and pain management experts and prescribing a TENS unit after noting that Plaintiff's MWAP medications had not been approved, she cannot be found to have been deliberately indifferent on this record.  With respect to the tapering of Plaintiff's medication, Dr. Mantaro explained, without contradiction, that there was no formal appeal process from the RMDs' denial of the MWAP request.  Accordingly, Dr. Mantaro is entitled to summary judgment, and her motion (23-CV-5661, dkt. no. 24) is granted as to Plaintiff Hernandez's claim of deliberate indifference.

With respect to Dr. Mueller, in rejecting the June 26, 2017 MWAP request for Neurontin she noted, "[n]o EMG or mention of 5 pt. sensory exam, diagnostic of peripheral neuropathy" and suggested using safer agents.  (Ex. A at Mantaro-021.)  Similarly in denying Dr. Miller's June 26 MWAP request to renew Plaintiff Hernandez's Ultram prescriptions, Dr. Mueller recommended "PT for back" and "counseling to accept recommended interventional pain procedures." (Id. at Mantaro-022-24.)  However, Dr. Carinci states that Plaintiff's "medical records show well documented and

longstanding chronic pain ailments that require consistent pain
management intervention to control." (Carinci Rpt., dkt. no.
352-30 at 3 (emphasis added).) Dr. Carinci noted numerous imagings
performed on Plaintiff Hernandez in 2002, 2003, 2004, 2010, 2016,
and 2017, documented his "chronic pain ailments." (Id. at 3-4.)
In addition to ignoring these imagings, Dr. Mueller also rejected
the recommendations of two experts (one surgeon and one pain
management expert on two occasions) and of DOCCS providers Drs.
Miller and Mantaro, as well as Plaintiff Hernandez's lengthy
history of effective pain management on his MWAP medications.
Based on the record before the Court, there is a question of fact
as to whether Dr. Mueller exercised her medical judgment in denying
the MWAP requests or whether she relied reflexively on the MWAP
policies. As in Ippolito, a jury could find that Dr. Mueller acted
with deliberate indifference by "reflexively rely[ing] on the
purported [medical] soundness of the [MWAP policy] itself, even
where [she was] on notice" by Plaintiff's past successful treatment
with MWAP medications and the recommendation of outside experts
and prison doctors "that a departure [from the MWAP policy] might
be medically appropriate." 2012 WL 4210125, at *13 (internal
quotations omitted); see also Johnson, 412 F.3d at 406.
Accordingly, Dr. Mueller's motion for summary judgment (23-CV-
5661, dkt. no. 29) as to Plaintiff Hernandez's claim of deliberate
indifference is denied.

**F. Plaintiff Knight's Claim for Deliberate Indifference**

Dr. Chung Lee seeks summary judgment dismissing the claim against him by Plaintiff Knight. (23-CV-5662, dkt. no. 12.)

As related by Dr. Carinci:

> Hugh Knight is currently in the custody of Shawangunk Correctional Facility. Mr. Knight is a partial paraplegic caused by multiple gunshot wounds from 1990. [] In 1991, he had spinal cord surgery. Mr. Knight's serious and traumatic injuries cause him severe and chronic pain that requires effective pain management. Mr. Knight has well documented neuropathy, bilateral leg pain, radiating shoulder pain, hip pain, degenerative lower back and cervical spine disease. [] Mr. Knight has ambulation issues that require him to use a wheelchair.

(Carinci Rpt., dkt. no. 355-1 at 3.)

As noted by Dr. Lee, the gunshot wounds initially left Plaintiff Knight paralyzed. (Declaration of Chung Lee, dated October 18, 2023 ("Lee Decl.: Knight") [23-CV-5662, dkt. no. 15] ¶ 13.) He later gained partial functionality and was able to walk with a cane. (Id.) When he transferred to Shawangunk in 2014, Plaintiff Knight was taking Neurontin which he continued to May 30, 2015, when he refused it. (Id. ¶ 14 (citing Ex. A [23-CV-5662, dkt. no. 15-1] at Lee001-02, 004).) In October of 2015, Dr. Lee re-prescribed Neurontin and added Flexeril in response to Plaintiff's complaints of pain. (Id. ¶ 15 (citing Ex. A at Lee007).) In November of 2015, because Plaintiff Knight refused to take his Neurontin, it was discontinued. (Id. ¶ 16 (citing Ex. A at Lee008).)

Following an evaluation at Albany Medical Center for "progressive peripheral neuropathy," the attending physician noted that Plaintiff stated that he had tried different medications to address his pain (Neurontin, Lyrica, Tramadol, Toradol, Gabapentin), in different combinations but nothing had been effective. (Id. ¶ 18.) The specialist prescribed Elavil, aspirin, and Flexeril. (Id.) Following a neurology consultation in March of 2016, the neurologist recommended an increase in Plaintiff Knight's Elavil prescription, which Dr. Lee ordered. (Id. ¶ 19 (citing Ex. A at Lee028, 029).) Dr. Lee increased Plaintiff's Elavil on March 14 and 31 of 2016 in an effort to address Plaintiff's complaints of pain. (Id. ¶ 20 (citing Ex. A at Lee030, 31).)

Even with the adjustments in his medications, however, Plaintiff Knight's pain increased in the spring of 2016. For example, on April 26, 2016, Plaintiff reported "[increased] pain due to recent need for [greater] ambulation when moved to C block[;] requesting closer cell to medical so he can walk to medication call out." (Carinci Rpt., dkt. no. 355-5 at H Knight 267.)

These complaints of pain continued without any change in medication. For example, on May 8, 2016, Plaintiff Knight failed to appear for a blood pressure check, reporting "too much pain in leg to move this far." (Carinci Rpt., dkt. no. 355-6 at H Knight

46

268.)  On May 16, he reported "footpain," and the provider noted "may change his cell" closer to the medical station.  (Id. at H Knight 269.)  For months, Plaintiff Knight refused blood pressure checks because pain prevented him from walking so far.  (Id. at H Knight 271 (5/21/16); H Knight 275 (6/12/16); H Knight 277 (6/26/16); H Knight 282 (10/21/16); H Knight 282 (11/22/16).) Although Dr. Lee referred Plaintiff to physical therapy for an appointment on May 6, 2016 (id. at H Knight 274), he failed to adjust Plaintiff's medication to reduce his pain.

A specialist recommendation dated August 31, 2016, suggested "consider adding Gabapentin [?] for pain control."  (Id. at H Knight 280.)  On September 30, 2016, the provider noted "severe neuropathy" and re-prescribed Elavil.  (Id. at H Knight 281.)

As set out in Dr. Lee's Declaration, from mid-February of 2017 through October of 2018, Plaintiff Knight presented no complaints of pain.  (Lee Decl.: Knight ¶¶ 21-34; see also Carinci Rpt., dkt. no. 355-6 at H Knight 295.)

On October 11, 2018, Plaintiff Knight complained of "excessive, neurotic pain" in his foot and requested "Lyrica or something like it."  (Lee Decl.: Knight ¶ 35 (citing Ex. A at Lee099).)  On October 30, Dr. Lee prescribed Cymbalta "which [in his] medical judgment was an appropriate medication to treat [Plaintiff's] complaints of pain."  (Id. ¶ 36 (citing Ex. A at Lee100).)  Plaintiff Knight continued on Cymbalta through the end

of 2018, and Dr. Lee renewed his prescription on January 15, 2019. (Id. ¶¶ 37-38.)  Plaintiff continued on Cymbalta with some changes in timing and dosage with no complaints of pain through November of 2019, when Dr. Lee retired.  (Id. ¶¶ 39-44.)

Plaintiff Knight argues that he had been prescribed Lyrica in October of 2006 and that prescription was continually approved until it was discontinued on June 8, 2011.  (See Pl. Opp'n at 35.) He argues that, after his transfer to Shawangunk in 2014, Dr. Lee was deliberately indifferent to Plaintiff Knight's pain because Lyrica had been shown to be effective for Plaintiff, but Dr. Lee failed to prescribe it.  (See id. at 35-36.)  Although, as noted above, Dr. Lee sent Plaintiff Knight for various expert consultations and followed the pain medication recommendations made by the experts, the record reflects a multi-month period mid-2016 when Plaintiff continually complained of pain so severe that he could not walk to have his blood pressure checked, during which time Dr. Lee failed to prescribe Lyrica or otherwise adjust Plaintiff's medications to alleviate or decrease his pain.  In light of Dr. Lee's intimate knowledge of Plaintiff Knight's medical history and Plaintiff Knight's continuing complaints, a jury could find that Dr. Lee was deliberately indifferent to Plaintiff's pain by failing to prescribe effective pain medication.  Accordingly, Dr. Lee's motion for summary judgment (23-CV-5662, dkt. no. 12) as to Plaintiff Knight's claim of deliberate indifference is denied.

48

### G. Plaintiff Mathis's Claim for Deliberate Indifference

State Represented Defendant Dr. Mueller moves for summary judgment to dismiss the claim against her by Plaintiff Mathis. (23-CV-5663, dkt. no. 14.)

As related by Dr. Carinci: "Mr. Mathis has documented chronic pain ailments that require pain management, including extensive disc degermation disease at L1-S1, and segmental spinal stenosis at L4-S1 with facet arthropathy, carpel tunnel syndrome in left wrist, and chronic rotator cuff tendinopathy." (Carinci Rpt., dkt. no. 356-26 at 3.) Dr. Carinci also reports that Plaintiff Mathis had been on Neurontin or Ultram from as early as April 2013 (id.), and had suffered two laminectomies on his lumbar spine, one in July of 2014, and one in November of 2016 (id. at 3, 4). After each one, the surgeons prescribed Neurontin. (Id.) Following an April 29, 2016 spinal X-ray showing extensive disc degeneration and segmental spinal stenosis with facet arthropathy, Plaintiff Mathis was on Ultram, which he refused at least once due to vomiting. (Id. at 4.)

Plaintiff Mathis complains of Dr. Mueller's denial of Dr. Lee's MWAP requests of June 26, 2017, July 27, 2017, and September 27, 2017. (See Pl. Opp'n at 37-39.)

On June 26, 2017, following X-rays and an EMG study on Plaintiff's left wrist, Dr. Lee submitted an MWAP request for Neurontin with eleven refills, which, as noted above, had been

effective in relieving Plaintiff Mathis's pain. (Carinci Rpt., dkt. no. 356-26 at 4; Carinci Rpt., dkt. no. 356-27 at T Mathis 086-089.) In the request, Dr. Lee noted under "Diagnosis," "s/p laminectomy x2, radiculopathy 14/5/s1." (Carinci Rpt., dkt. no. 356-27 at T Mathis 087.) He noted specialty consultations, "ort; laminectomy x2, pai[n]; facet injection 12-9-15," and "Treatment options attempted/step therapy:" "surgery, back brace, facet injection, pth & [non-steroidal anti-inflammatory drugs]." (Id.) Dr. Mueller approved only a one-month supply, commenting: "Recommend [follow-up] w/ Pain Management, PT, Neurosurg/Ortho as indicated. Safer agents indicated such as Lamictal >>>Cymbalta, Lidoderm patches, Voltaren gel, etc. Please contact me for Lamictal titrating dosage schedule." (Carinci Rpt., dkt. no. 356-27 at T Mathis 089-90.)

While Plaintiff Mathis was in the Shawangunk infirmary for lower back pain, on July 31, 2017, Dr. Lee submitted to Dr. Mueller an MWAP request for a two-week supply of Ultram with no refills. (Carinci Rpt., dkt. no. 356-28 at T Mathis 106-07.) Dr. Mueller denied the request, commenting: "You failed to mention that pt is also on Neurontin 2400 mg. In that approval, recommended referral to PT, Pain Management, Neurosurg, etc. None on of these recommendations have been followed. Will approve 5 day supply only. Please submit new request accordingly. Also, please updated

[sic] form when you do so, as requested several times in the past."
(Id. at T Mathis 108-109.)

Plaintiff Mathis's pain did not abate.  (See, e.g., id. at T
Mathis 101 (July 14, 2017 notes of "burning in lower back and legs
going numb severe pain [right] side lower back"); id. at T Mathis
101 (July 25, 2017 notes of "[complaint of] numbness, tingling
[down] both legs, [and] burning sensation").)

On September 27, 2017, Dr. Lee submitted an MWAP request to
Dr. Mueller for Neurontin with eleven refills.  (Id. at T Mathis
122-24.)  He noted under radiologic testing an August 23, 2017
film showing "ctb; recurrent spinal stenonis."  (Id.)  Again, Dr.
Mueller denied the request, commenting: "No EMG, PE noted.  MWAP
of 6/27 recommended use of safer agents with many alternatives
listed.  Obviously no changes made in 3 month interim.  Please
taper to d/c.  Please refer to earlier MWAP and lecture and
handouts of 8/17 for further assistance with management options.
Also, once again you are using incorrect form."  (Id. at T Mathis
125-126.)  In November of 2017, Plaintiff was again admitted to
the infirmary for uncontrolled lower back pain and chest pain.
(Id. at T Mathis 129.)

In denying Dr. Lee's June 26, 2017, July 27, 2017, and
September 27, 2017 MWAP requests, asking for more tests and
advocating "safer alternatives", Dr. Mueller disregarded the:

1. Voluminous testing Plaintiff Mathis had undergone which confirmed his pain;

2. The recommendations of outside experts to treat Plaintiff's pain with Neurontin and Ultram;

3. Plaintiff's prior effective treatment with Neurontin and Ultram; and

4. The recommendation of Plaintiff's treating prison physician for Neurontin and Ultram.

Accordingly, a question of fact exists as to whether Dr. Mueller exercised her medical judgment in denying the MWAP requests—as she stated in her post-litigation declaration—or whether she relied reflexively on the MWAP policies—as stated in her denials of the MWAP requests.  As in Ippolito, a jury could find that Dr. Mueller acted with deliberate indifference by "reflexively rely[ing] on the purported [medical] soundness of the [MWAP policy] itself, even where [she was] on notice" by Plaintiff's past successful treatment with MWAP medications and the recommendation of outside experts and prison doctors "that a departure [from the MWAP policy] might be medically appropriate."  2012 WL 4210125, at *13 (internal quotations omitted); see also Johnson, 412 F.3d at 406. Accordingly, Dr. Mueller's motion for summary judgment (23-CV-5663, dkt. no. 14) as to Plaintiff Mathis's claim for deliberate indifference is denied.

**H. Plaintiff Pritchett's Claim for Deliberate Indifference**

State Represented Defendants Dr. David Dinello and Dr. Susan Mueller move for summary judgment to dismiss the claims against them by Plaintiff Pritchett.  (23-CV-5664, dkt. no. 16.)

As reported by Dr. Carinci:

> Mr. Sean Pritchett is a wheelchair bound amputee that is currently residing in Shawangunk Correctional Facility. He has an above the right knee amputation that has resulted in severe nerve pain in his stump and significant phantom pain. [] Mr. Pritchett's nerve and phantom pain is a chronic condition that requires effective pain management control.  In addition, he also suffers from back pain, degenerative discogenic changes in his lower back, degenerative joint disease in his elbow, and severe degenerative disease in his hip, along with muscle spasms. [] For years, Mr. Pritchett was treated effectively with Lyrica to manage his severe nerve and phantom pain.

(Carinci Rpt., dkt. no. 358-6 at 3.)

Dr. Carinci reported that as early as October of 2007, Plaintiff was seen by a neurology specialist and reported that his Neurontin was not helping.  (Id.)  The specialist recommended Lyrica, and Plaintiff Pritchett's dosage was increased.  (Id.)  After a December 2007 consultation with a pain therapist, the therapist recommended increasing his Lyrica dosage.  (Id. at 3-4; id. at S Pritchett 024.)  In 2014, a pain specialist again recommended Lyrica, and Plaintiff Pritchett's dosage was increased in August of 2014. (Id. at 4.)

With respect to the MWAPs at issue, Dr. Carinci reports:

> In January of 2017, Dr. Lee requested the renewal of Mr.
> Pritchett's effective Lyrica medication. The non-
> formulary request went to RMD David Dinello who denied
> the renewal reasoning that he "will not approve a
> controlled/scheduled substance for a chronic pain issue
> that is not life or limb threat[en]ing. The risk/benefit
> ratio is too high." [] RMD Dinello made this decision
> without ever treating Mr. Pritchett or discussing Mr.
> Pritchett's history with Dr. Lee. Based on RMD Dinello's
> denial, on January 30, 2017, Mr. Pritchett was placed
> back on Neurontin 1200mg TID and Cymbalta 30mg PO and
> was never provided Lyrica again. [] On February 1, 2017
> Mr. Pritchett reported to emergency sick call with
> nausea, vomiting, headaches due to the withdrawal of
> Lyrica. [] Two weeks later, Mr. Pritchett reported to
> sick call continual diarrhea since being taken off
> Lyrica and the pain in his stump had increased. [] On
> February 21, 2017 Mr. Pritchett again complained to sick
> call that he was in severe pain and that he could not
> deal with the pain and wanted to see pain management and
> a neurosurgeon. [] On February 27, 2017 Dr. Lee noted
> his increased pain since change from Lyrica to Neurontin
> in his medical records, yet nothing was done.

(Id. at 6.)

Dr. Dinello confirmed this reasoning (or lack thereof)

in his declaration:

> In response to the request for Lyrica, and after
> considering the medical and social information, I did
> not approve a controlled/scheduled substance for chronic
> pain issue such as Plaintiff's because it was not life
> or limb threatening. [] It was my medical judgment that
> the risks of prescribing a controlled/scheduled
> substance with abuse potential far outweighed the
> benefits in a case like Plaintiff's. Instead, I
> suggested that Plaintiff could again be prescribed
> Gabapentin, if necessary, because for this patient at
> this time, it was a safer drug than the requested Lyrica.

(Declaration of Dr. David S. Dinello, dated November 15, 2023

("Dinello Decl.: Pritchett") [23-CV-5664, dkt. no. 17]

¶¶ 37-38.)

That Dr. Dinello refused an effective medication that Plaintiff had been taking for many years because the chronic pain "was not life or limb threatening" might well be the definition of deliberate indifference to a patient's pain. Accordingly, Dr. Dinello's motion for summary judgment (23-CV-5664, dkt. no. 16) as to Plaintiff Pritchett's claim for deliberate indifference is denied.

Plaintiff Pritchett also complains of Dr. Mueller's September 28, 2017 denial of an MWAP request.[6] As set out in Dr. Carinci's Report, on June 16, 2017, Dr. Lee submitted an MWAP request to RMD Mueller for a year's supply of Neurontin which RMD Mueller approved, but only for three months. (Carinci Rpt., dkt. no. 358-6 at 5; Carinci Rpt., dkt. no. at 358-11 at S Pritchett 177-80.)  When Dr. Lee submitted the follow up request on September 27, 2017, RMD Mueller did not approve it, stating "Unclear when and why changed from Lyrica to Neurontin.  Recommend change to safer agent until surgica[l] relief obtained." (Carinci Rpt., dkt. no. at 358-11 at S Pritchett 185-87.)  Aside from the fact that RMD Mueller's reason for denying the MWAP request is not a medical reason, had she merely reviewed Plaintiff Pritchett's

---

[6] Plaintiff's Opposition incorrectly notes the date of the MWAP as September 28, 2018, (Pl. Opp'n at 40), but the documents cited establish the date was 2017.

medication history, she would have seen that it was Dr. Dinello who ordered Dr. Lee to change from Lyrica, which had effectively treated Plaintiff's pain for years, to Neurontin, which was less effective.  (See Carinci Rpt., dkt. no. 358-10 at S Pritchett 169-169A.)  Dr. Mueller repeated that reason in her declaration.  (Declaration of Dr. Susan C. Mueller, dated November 13, 2023 ("Mueller Decl.: Pritchett") [23-CV-5664, dkt. no. 18] ¶ 27.)

Based on the record before the Court, there is a question of fact as to whether Dr. Mueller exercised her medical judgment in denying the MWAP request (for a non-medical reason)—as she stated in her post-litigation declaration—or whether she relied reflexively on the MWAP policies then in effect.  As in Ippolito, a jury could find that Dr. Mueller acted with deliberate indifference by "reflexively rely[ing] on the purported [medical] soundness of the [MWAP policy] itself, even where [she was] on notice" by Plaintiff's past successful treatment with MWAP medications and the recommendation of outside experts and prison doctors "that a departure [from the MWAP policy] might be medically appropriate."  2012 WL 4210125, at *13 (internal quotations omitted); see also Johnson, 412 F.3d at 406.  Accordingly, Dr. Mueller's motion for summary judgment (23-CV-5664, dkt.

no. 16) as to Plaintiff Pritchett's claim for deliberate indifference is denied.

### I. Plaintiff Rivera-Cruz's Claim for Deliberate Indifference

State Represented Defendant Dr. Susan Mueller moves for summary judgment to dismiss the claim against her by Plaintiff Rivera-Cruz. (23-CV-5667, dkt. no. 15.)

As related by Dr. Carinci, "Felipe Rivera-Cruz suffers from peripheral neuropathy and paraplegia due to gunshot wounds suffered in 2003. (Carinci Rpt., dkt. no. 360-1 at 3 (citing id. at Rivera Cruz 025-26).)  He is wheelchair bound and can ambulate about fifty feet with the use of a walker and knee ankle feet orthotics ("KAFOs"). (Id. (citing id. at Rivera Cruz 026).)  He occasionally suffers from spasms in his lower extremities. (Id.)

Plaintiff Rivera-Cruz entered the Riker's Island facility in 2011 and took, inter alia, Lyrica for, inter alia, peripheral neuropathy. (Id.)  Upon transfer to Downstate Correctional Facility in February of 2013, his neuropathy was treated with, inter alia, Neurontin. (Id.)  Later that month when he transferred to Five Points Correctional Facility, he was discontinued from Neurontin and placed back on Lyrica. (Id.)  On March 15, Plaintiff Rivera-Cruz complained of spasms, was started on physical therapy, and on March 28, started to take Baclofen for muscle spasms. (Id.)  In July, he began taking Elavil to treat his pain. (Id.)  Providers at Five Points continued to treat Plaintiff's neuropathy and spasms

with Lyrica, Elavil, and Baclofen until April 10 when they switched off Lyrica and back to Neurontin.  (Id.)  In August of 2014, Plaintiff Rivera-Cruz's Neurontin dosage was increased, and on March 6, 2015, his Neurontin was increased again as well as Baclofen, and his Elavil was discontinued.  (Id.)  When transferred in July of 2015 to Shawangunk Correctional Facility, Plaintiff continued on Baclofen and Neurontin, then went off of Neurontin, and then went back on an increased dose of Neurontin on October 20, 2015.  (Id.)

On August 25, 2016, Plaintiff Rivera-Cruz saw Dr. George Forrest for an EMG.  (Id. at 4.)  Dr. Forrest confirmed neuropathy and wrote, "[t]he medications of choice are Lyrica, Neurontin, Cymbalta, Effexor, and tricyclic anti-depressants.  Neurontin is associated with edema (swelling)[;] the anti-depressants do not have that side effect."  (Id.)  Plaintiff's providers thereafter discontinued Neurontin and took him on and off of Elavil.  (Carinci Rpt., dkt. no. 360-1 at 4.)  Thus, Plaintiff Rivera-Cruz remained only on Baclofen to treat his ailments.  (Id.)

On June 15, 2017 Plaintiff Rivera-Cruz's provider, Dr. Chung Lee, requested approval for Plaintiff to remain on Baclofen.  (Id. (citing Carinci Rpt., dkt. no. 360-3 at Rivera Cruz 116-17.)  RMD Mueller denied the request stating only that "information provided does not meet criteria for approval."  (Carinci Rpt., dkt. no. 360-3 at Rivera Cruz 118.)  Accordingly, Plaintiff Rivera-Cruz's

Baclofen prescription was discontinued, and he lost his "effective pharmacological treatment for his neuropathy." (Carinci Rpt., dkt. no. 360-1 at 4.)[7]

In her declaration, however, RMD Mueller states the following with respect to Dr. Lee's MWAP request to continue Baclofen:

> Per my standard practice, I reviewed the Plaintiff's medical records after receiving this request. I did not see an indication that he was suffering from spasticity. I also noted that Plaintiff did not appear to have recently complained of neuropathic pain, had stated that physical therapy previously relieved his pain. But, again, even if he had been making such complaints, treatment of neuropathic pain with Baclofen would have been medically inappropriate. I further noted that the physician who performed a recent EMG on Plaintiff to confirm the presence of neuropathy had recommended that Plaintiff's neuropathic pain be treated with tricyclic antidepressants instead.

(Declaration of Dr. Susan C. Mueller, dated May 20, 2021 ("Mueller Decl.: Rivera-Cruz") [23-CV-5667, dkt. no. 17] ¶ 27.) As Plaintiff Rivera-Cruz argues in opposition, however, he also suffers from well-documented muscle contractures. (Agnew Decl., Ex. 80 [23-CV-5667, dkt. no. 29-104] at RIVERA CRUZ FHS1 25-36, 49, 88, 91, 93, 97, 100-105 and 122.) Between 2016-2017, the FHS1 system

---

[7] Dr. Carinci notes that several months thereafter on May 22, 2019, the "Shawangunk Inmate Liaison Committee noted that the 'inmates are complaining that they are not being treated adequately for their injuries and that regardless of how severe or serious they are, Dr. Lee just about seems to always prescribe Tylenol or Motrin.' [] Mr. Rivera-Cruz continued to complain of pain and being provided only Tylenol or Motrin. [] After complaining of leg pain on December 3, 2019, he was issued Tylenol and Motrin." (Id.)

documented at least twenty-one physical therapist notes that memorialize Plaintiff Rivera-Cruz's muscle contractures. (Ibid.) Muscle contractures occur when muscle spasticity is uncontrolled. (Pl. Opp'n at 41 (citing RMD Mueller's Local Civil Rule 56.1 Statement of Undisputed Facts, dated November 15, 2023 ("Mueller 56.1 Stmt.: Rivera-Cruz") [23-CV-5667, dkt. no. 26] ¶ 14).)

Based on the record before the Court, there is a question of fact as to whether Dr. Mueller exercised her medical judgment in denying the MWAP request—as she stated in her post-litigation declaration—or whether she denied it reflexively for the non-medical reason that the "[i]nformation provided [did] not meet criteria for approval"—as stated in her denial of the MWAP request. (Carinci Rpt., dkt. no. 360-3 at Rivera Cruz 118.) As in Ippolito, a jury could find that Dr. Mueller acted with deliberate indifference by "reflexively rely[ing] on the purported [medical] soundness of the [MWAP policy] itself, even where [she was] on notice" by Plaintiff's past successful treatment with MWAP medications and the recommendation of outside experts and prison doctors "that a departure [from the MWAP policy] might be medically appropriate." 2012 WL 4210125, at *13 (internal quotations omitted); see also Johnson, 412 F.3d at 406. Accordingly, Dr. Mueller's motion for summary judgment (23-CV-5667, dkt. no. 15) as to Plaintiff Rivera Cruz's claim for deliberate indifference is denied.

**J. Plaintiff Stewart's Claim for Deliberate Indifference**

State Represented Defendant Dr. Susan Mueller moves for summary judgment to dismiss Plaintiff Stewart's claim against her. (23-CV-5668, dkt. no. 16.)

Plaintiff Wayne Stewart suffers from paraplegia as a result of a 2003 gunshot wound and the subsequent amputation of his right leg and is wheelchair bound. (Carinci Rpt., dkt. no. 361-18 at 3; Defendant Dr. Susan Mueller's Response to Plaintiff's Statement of Additional Material Facts Precluding Summary Judgment, dated March 12, 2024 ("Mueller PSUF Response: Stewart") [23-CV-5668, dkt. no. 39] at 2.) As a result of his injuries, Plaintiff Stewart suffers from chronic pain. (Carinci Rpt., dkt. no. 361-20 at W Stewart 117.) At the time of his transfer to DOCCS custody in April 2017, Plaintiff Stewart's medication was listed as MS Contin. (Carinci Rpt., dkt. no. 361-18 at 1.) In June 2017, Plaintiff's MS Contin was changed to short-acting Percocet. (Plaintiff's Response to Defendant's Statements of Undisputed Facts and Plaintiff's Statement of Additional Material Facts Precluding Summary Judgment, dated January 1, 2023 ("PSUF: Stewart") [23-CV-5668, dkt. no. 25] ¶ 157.)

On June 26, 2017, Dr. Chung Lee submitted an MWAP Request to Dr. Mueller for renewal of Plaintiff Stewart's Percocet prescription at 5 mg for 30 days to treat his pain. Mueller 56.1 Stmt.: Stewart ¶¶ 8-9.) Dr. Mueller denied the request, writing

"Nothing on this form to support round the clock usage of Percocet. Remote [gunshot wounds] does not equate severe pain necessitating strong narcotic analgesia."  (Carinci Rpt., dkt. no. 361-20 at W Stewart 104.)    Dr. Mueller suggested Dr. Lee "explore safer avenues" of treatment with Plaintiff.  (Id.)  In her declaration, Dr. Mueller stated "[t]he information provided on the MWAP Request was not sufficient to justify the renewal of the prescription for Percocet" and that in her opinion "there was . . . nothing on the MWAP Request form" to support its administration.  (Declaration of Dr. Susan C. Mueller, dated May 20, 2021 ("Mueller Decl.: Stewart") [23-CV-5668, dkt. no. 17] ¶¶ 23, 26.)  Dr. Mueller also referenced information provided by Dr. Lee on the MWAP Request form regarding Plaintiff's condition and noted that his medical records indicated he had broken his leg in 2017.  (See id. ¶¶ 25-26.)

Dr. Mueller argues that Plaintiff cannot satisfy the subjective prong of the deliberate indifference inquiry because the evidence demonstrates she made a principled decision "based upon the MWAP Request, her review of the Plaintiff's medical records, and her medical knowledge and experience[.]"  (Memorandum of Law in Support of State Represent Defendant's Motion for Summary Judgment, dated November 15, 2023 ("SRD MSJ Br.: Stewart") [23-CV-5668, dkt. no. 20] at 12-13.)  However, viewing the record in the light most favorable to the non-moving party, there is an issue of fact as to whether Dr. Mueller reviewed Plaintiff Stewart's

medical records to form an independent medical judgment or instead relied solely on the information presented in the MWAP Request form and the MWAP policies.   While Dr. Mueller states that she "review[ed] the information submitted for this patient" (Mueller Decl.: Stewart ¶ 28), she never specifies what information that included.   Similarly, Dr. Mueller states that generally it was her "practice to consider all criteria in determining whether prescription of an MWAP medication would be appropriate" (id. ¶ 18), but never explains the criteria.    There is also no indication that Dr. Mueller specifically considered the efficacy of Plaintiff Stewart's prior Percocet treatment or the risk that his pain would worsen if he was taken off Percocet in favor of an alternative treatment.

Under these circumstances, a reasonable jury could conclude that Dr. Mueller disregarded an excessive risk that Plaintiff Stewart would suffer a great and unnecessary degree of chronic pain if she did not approve the renewal of his Percocet prescription.   See Brock, 315 F.3d at 164.   According, Dr. Mueller's motion for summary judgment (23-CV-5668, dkt. no. 16) as to Plaintiff Stewart's claim for deliberate indifference is denied.

### K. Qualified Immunity Defense

In evaluating Defendants' qualified immunity defense, the Court first seeks to identify the right that Plaintiffs assert was

clearly established and that Defendants violated.  See Knight v. N.Y. State Dep't of Corr., No. 18-CV-7172, 2022 WL 1004186, at *18 (S.D.N.Y. Mar. 30, 2022).  Plaintiffs assert that the clearly established right each of the Defendants should have known he or she was violating was each Plaintiff's right to be free from prison officials' "deliberate[] indifferen[ce] to an inmate's serious medical needs."  (Pl. Opp'n at 67.)

In each of their motions for summary judgment, the State Represented Defendants argue the right was narrower, defining it in terms of each Plaintiff's specific treatment.  For example, with respect to Plaintiff Gradia, the State Represented Defendants argue the right RMD Mueller violated was "in August 2017 to deny a request for Ultram, and in June 2018 to deny a request for Neurontin—that is, to deny long-term prescriptions of medications that have addictive qualities and potentially serious side-effects—in favor of safer treatment strategies and medications." (SRD MSJ Br.: Gradia at 29.)  Similarly, for Plaintiff Dockery, the SRDs define the right violated by RMD Mueller as the "denial of an MWAP request seeking to restart Plaintiff on Neurontin" and the right violated by RMD Dinello as the "denial of an MWAP request to treat Plaintiff with Neurontin and recommend[ation] that Neurontin be gradually tapered over a four week period and replaced with a safer non-habit forming nerve modulating agent effective in MS treatment instead."  (Memorandum of Law in Support of State

Represented Defendants' Motion for Summary Judgment, dated
November 15, 2023 ("SRD MSJ Br.: Dockery") [23-CV-5658, dkt. no.
35] at 30-32.)

Dr. Chung Lee does not articulate a particular right, instead
arguing that "[t]he constitutional violation here is dependent on
a myriad of unique facts regarding individual treatment decisions"
and cannot fit within any clearly established right, thereby
entitling him to qualified immunity. (Defendant Chung Lee's
Amended Memorandum of Law in Support of his Motion for Summary
Judgment, dated November 21, 2023 ("Lee MSJ Br.: Knight") [23-CV-
5662, dkt. no. 19] at 21.)[8]

At a minimum, Plaintiffs have a "right to be free from
deliberate indifference to serious medical needs." See LaBounty,
137 F.3d at 74 (rejecting defendants' narrower view that the right
at issue in the plaintiff's Eighth Amendment claim was a "right to
be free from crumbling asbestos"). However, because Court of
Appeals precedent demands defining the "clearly established right"
with specificity as to the particular conduct, see Vega, 963
F.3d at 275, the Court finds that a narrower definition of
Plaintiffs' right at issue is required.

---

[8] Because the Court determines Dr. Mantaro's care did not amount
to deliberate indifference and grants her motion for summary
judgment, see supra Part IV.E, the Court need not evaluate her
qualified immunity argument. (See Memorandum of Law in Support of
Her Motion for Summary Judgment ("Mantaro MSJ Br.: Hernandez")
[23-CV-5661, dkt. no. 28] at 19.)

1.  <u>The SRDs' Qualified Immunity Defense</u>

In <u>Griffin v. Amatucci</u>, an inmate at Upstate Correctional Facility alleged that a doctor and a nurse at the facility had violated the Eighth Amendment "by refusing to provide him with a treating-physician-recommended humidifier for his . . . [CPAP] machine pursuant to a policy of not providing humidifiers." 611 F. App'x at 734. The Court of Appeals relied on <u>Johnson v. Wright</u> and <u>Brock v. Wright</u> to conclude that the "clearly established right" at issue was a right to be free from a "reflexive application of [a] . . . policy in the face of a contrary recommendation by [plaintiff's] treating physician[.]" <u>Id.</u> at 735. Given the similarities between the allegations in <u>Griffin</u> and the ones Plaintiffs have put forth in the instant cases, the Court finds the Court of Appeals' reasoning persuasive.

<u>Johnson</u>, on which the Court of Appeals relied in <u>Griffin</u>, is even more on point to the facts of the instant cases and provides what this Court finds is the appropriately tailored right in the assessment of the State Represented Defendants' qualified immunity defense. In <u>Johnson</u>, the plaintiff claimed New York State corrections officials were deliberately indifferent to his serious medical needs because the officials had denied a request from the plaintiff's treating physician to prescribe the plaintiff a particular medication to treat his Hepatitis C. <u>See</u> <u>Johnson</u>, 412 at 400-02. The officials had denied the physician's request

66

because a department policy in effect at the time permitted the officials to deny such treatment if an inmate had a recent history of substance abuse, which the plaintiff did. See id. at 401.

In its review of the plaintiff's argument that the officials had violated the Eighth Amendment, the Court of Appeals framed the question in the case as whether "the application of the policy" of denying Hepatitis C medications to inmates with a history of substance abuse "in plaintiff's case could have amounted to deliberate indifference to plaintiff's medical needs." Id. at 404. In vacating the district court's decision granting summary judgment to the defendant corrections officials on this question, the Court of Appeals held that a jury could find that "the defendants acted with deliberate indifference by reflexively relying on the medical soundness of the . . . substance abuse policy when they had been put on notice that the medically appropriate decision could be, instead, to depart from the [policy] and prescribe" the medication the inmate's treating physician recommended. Id. at 406. The Court of Appeals articulated a similar question of deliberate indifference two years prior in Brock: "whether following [a] policy" forbidding certain treatments absent particular symptoms resulted in unconstitutional deliberate indifference to the plaintiff's medical needs. See Brock, 315 F.3d at 162, 166.

The Court finds that the Eighth Amendment right the Court of Appeals articulated in Johnson—the right to be free from reflexive application of a policy denying a medication to any inmate with substance abuse risk—provides the clearly established right to analyze the State Represented Defendants' qualified immunity argument given the degree of similarity to the allegations each Plaintiff has put forth.  The Court also concludes that the right defined in Johnson is defined specifically enough to render it clearly established in the context of Eighth Amendment claims. See Collymore, 74 F.4th at 30; Vega, 963 F.3d at 275.

As in Johnson and Brock, the ten related actions that this Opinion addresses involve (1) a treating physician's request to implement a particular treatment, (2) senior corrections officials' rejection of that request, (3) due to a policy favoring such rejection.  And, as in Johnson specifically, the treating physicians here sought to prescribe medications that the officials rejected because the policy in question favored such rejections due to the risk of substance abuse.  In both Johnson and Brock, the Court of Appeals held that granting summary judgment for the prison officials would be inappropriate because a jury could conclude, based on the evidence, that the prison officials' deference to policy constituted deliberate indifference because it was made without sufficient consideration of the inmate's medical

needs or of the treating physician's recommendation.  See Johnson,
412 F.3d at 404-06; Brock, 315 F.3d at 167.

Therefore, the Court finds that the Court of Appeals has
spoken sufficiently clearly in holding that inmates have an Eighth
Amendment right not to have prison officials rely on a policy to
reject a request for a medication when the officials know it might
be medically appropriate to prescribe the medication instead.
Because the Court of Appeals ruled on this right nearly two decades
ago, and later reiterated the right in Griffin, it should have
been "clear to a reasonable officer" that Defendants' treatment of
Plaintiffs was unlawful.  See Ziglar, 582 U.S. at 152.
Accordingly, Plaintiffs' rights were clearly established and not
subject to the SRDs' qualified immunity defense.  See id.

2.  Dr. Lee's Qualified Immunity Defense

Dr. Lee argues that there can be no clearly established
constitutional right because the violation depends on Dr. Lee's
individual treatment decisions and Dr. Lee provided "professional,
adequate, and reasonable treatment" to Plaintiff Knight.  (See Lee
MSJ Br.: Knight at 19-21.)

Dr. Lee would be entitled to immunity "if either (a) [his]
action[s] did not violate clearly established law, or (b) it was
objectively reasonable for [him] to believe that his action did
not violate such law."  Johnson v. Newburgh Enlarged Sch. Dist.,
239 F.3d 246, 250 (2d Cir. 2001) (internal quotations and citations

omitted).   However, the Court finds that the particular right
clearly established by law as applicable to Dr. Lee—as distinct
from each Plaintiff's clearly established right to be free from
the RMDs' reflexive application of a policy in determining his
medical treatment—is the right to be free from a physician's
deliberate indifference to his medical needs through "consciously
choos[ing] an easier and less efficacious treatment plan." Chance,
143 F.3d at 703 (internal quotations and citations omitted).   The
Court of Appeals not only articulated this right in Chance v.
Armstrong but reaffirmed in Brock that it is a right protected by
the Eighth Amendment.   See Brock, 315 F.3d at 167.

As the Court described in detail above, there remain genuine
issues of material fact about whether Dr. Lee's failure to adjust
Plaintiff Knight's medications to alleviate his pain, in the face
of Plaintiff's repeated complaints of pain so severe he was unable
to walk, constituted knowing and deliberate indifference to
Plaintiff's medical needs, including by consciously choosing an
easier, less efficacious treatment plan than was warranted.   See
Chance, 143 F.3d at 703.   Thus, at this stage, the Court cannot
conclude as a matter of law that Dr. Lee did not violate a clearly
established right.

Because of those same disputed facts, the Court cannot find
that Dr. Lee is entitled to qualified immunity on the basis of her
objective    reasonableness.      "[W]here . . . the    objective

reasonableness of an officer's actions depends on disputed facts, summary judgment based on qualified immunity is properly denied." Knight, 2022 WL 1004186, at *18 (internal quotations and citations omitted).  This is because the question of reasonableness in a physician's treatment of a prisoner is "not whether [the physician's] actions were objectively reasonable based on [the physician's] own version of his [or her] actions" but on whether the physician's actions "were objectively reasonable based on the record viewed in the light most favorable to [the plaintiff] and with all inferences drawn in [the plaintiff's] favor." Warren v. Chakravorty, No. 03-CV-8736, 2006 WL 2067736, at *8 (S.D.N.Y. July 25, 2006) (denying summary judgment based on a qualified immunity defense).  Taking the record in the light most favorable to Plaintiff Knight, as the Court must on Dr. Lee's motion, the Court concludes that a reasonable jury could conclude that Dr. Lee's failure to prescribe Lyrica or otherwise adjust Plaintiff Knight's medications during a multi-month period was not objectively reasonable, given Dr. Lee's intimate knowledge of Plaintiff's conditions and his earlier prescriptions for pain medications. Accordingly, Dr. Lee is not entitled to summary judgment on the basis of qualified immunity.  See Newburgh Enlarged Sch. Dist., 239 F.3d at 250; Knight, 2022 WL 1004186, at *18; Chance, 143 F.3d at 703.

**L. Exhaustion of Remedies**

The State Represented Defendants claim that certain of Plaintiffs Dockery, Gradia, and Pritchett's claims stemming from specific MWAP denials must be dismissed for failure to exhaust their administrative remedies. (See SRD MSJ Br.: Dockery at 16-20; SRD MSJ Br.: Gradia at 31-32; Memorandum of Law in Support of State Represented Defendants' Motion for Summary Judgment, dated November 16, 2023 ("SRD MSJ Br.: Pritchett") [23-CV-5664, dkt. no. 22] at 24-26.)

Under the Prisoner Litigation Reform Act ("PLRA"), "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "The PLRA's exhaustion requirement 'applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong.'" Giano v. Goord, 380 F.3d 670, 675 (2d Cir. 2004) (quoting Porter v. Nussle, 534 U.S. 516, 532 (2002)).

A court may not excuse a failure to exhaust, even to take "special circumstances" into account. Ross v. Blake, 136 S. Ct. 1850, 1856 (2016). However, a prisoner cannot be required to exhaust administrative remedies that are not available to him.

<u>Id.</u> at 1858. "[A]n inmate is required to exhaust those, but only those, grievance procedures that are 'capable of use' to obtain 'some relief for the action complained of.'" <u>Id.</u> at 1859 (quoting <u>Booth v. Churner</u>, 532 U.S. 731, 738 (2001)). An administrative procedure is "unavailable" (1) when it operates as a simple dead end, with officers unable or consistently unwilling to provide any relief to aggrieved inmates; (2) when it is so opaque that no ordinary prisoner can discern or navigate it; and (3) when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation. <u>Id.</u> at 1859-60. The Court of Appeals has remarked "that the three circumstances discussed in <u>Ross</u> do not appear to be exhaustive" but has declined to "opine on what other circumstances might render an otherwise available administrative remedy actually incapable of use." <u>Williams v. Corr. Officer Priatno</u>, 829 F.3d 118, 123 n.2 (2d Cir. 2016). "[T]he test for deciding whether the ordinary grievance procedures were available must be an objective one: that is, would a similarly situated individual of ordinary firmness have deemed them available." <u>Lucente v. Cnty. of Suffolk</u>, 980 F.3d 284, 311-12 (2d Cir. 2020).

In addition, "a claim may be exhausted when it is closely related to, but not explicitly mentioned in an exhausted grievance." <u>Colón v. N.Y.State Dep't of Corr. & Cmty. Supervision</u>, No. 15-CV-7432, 2019 WL 5294935, at *7 (S.D.N.Y. Oct. 17, 2019)

(citation omitted).  Ultimately, in order to exhaust under the PLRA, a prisoner must allege facts sufficient to allow DOCCS to take appropriate responsive measures.  See Johnson v. Testman, 380 F.3d 691, 697 (2d Cir. 2004), overruled on other grounds by Woodford v. Ngo, 548 U.S. 81 (2006); see also Espinal v. Goord, 558 F.3d 119, 126 (2d Cir. 2009) ("The point is that prison officials [have] the necessary information to investigate the complaints and the opportunity to learn which officers were involved in the alleged incident.").

First, as to Plaintiff Dockery, the State Represented Defendants argue that Plaintiff failed to exhaust for RMD Mueller's August 2018 denial of Neurontin.  (SRD MSJ Br.: Dockery at 18.)[9] However, the State Represented Defendants acknowledge that Plaintiff Dockery employed the appropriate administrative procedures with respect to DOCCS' denial of Neurontin in September 2017.  (Id. at 18-19.)  Where "a prior grievance identifies a specific and continuing complaint that ultimately becomes the basis for a lawsuit," Johnson v. Killian, 680 F.3d 234, 238-39 (2d Cir. 2012), "the prior grievance is sufficient to exhaust a prisoner's administrative remedies with respect to continuing

---

[9] The State Represented Defendants also argue that Plaintiff Dockery failed to exhaust his claims against NP Saloti and RMD Hammer.  (Id.)  Given the Court's holding that NP Salotti and RMD Hammer are entitled to summary judgment on these claims (see supra Part IV.C), the Court need not address these exhaustion arguments.

violations at the facility." Alster v. Fischer, No. 09-CV-6510, 2017 WL 3085842, at *9 (W.D.N.Y. July 20, 2017). The Court concludes that, as in Johnson, Plaintiff Dockery's September 2017 grievance put DOCCs on notice of and provided it with an opportunity to resolve the same problem that continued intermittently over subsequent years with respect to Plaintiff's pain. 680 F.3d 234 at 238-39. The issue Plaintiff Dockery would have raised in 2018 was identical to the issue he had raised in 2017—the denial of Neurontin. Moreover, the record indicates that Plaintiff's 2017 grievance was not addressed until January 30, 2019. (See Agnew Decl., Ex. 43 [23-CV-5660, dkt. no. 32-55] at 2.) Accordingly, Plaintiff Dockery's 2017 grievance regarding Neurontin was sufficient to exhaust his administrative remedies regarding the 2018 denial of Neurontin.

Second, with respect to Plaintiff Gradia, the State Represented Defendants claim Plaintiff failed to exhaust his remedies for the June 2017 MWAP request for Neurontin. (SRD MSJ Br.: Gradia at 32.)[10] Likewise, the State Represented Defendants contend that Plaintiff Pritchett failed to exhaust available

---

[10] The State Represented Defendants argue Plaintiff Gradia failed to exhaust for all claims except the June 2018 and August 2017 denials (id.), but as discussed supra Part IV.D, the Court confined its decision to the only two denials addressed in Plaintiffs' Opposition: the denials in June 2017 and August 2017. (See Pl. Opp'n at 32-33.)

remedies as to his claim against RMD Dinello arising from the January 2017 request for Lyrica.  (SRD MSJ Br.: Pritchett at 25-26.)

Even assuming Plaintiffs failed to submit grievances for certain MWAP denials, the Court agrees with Plaintiffs that the record demonstrates administrative remedies were unavailable to Plaintiffs.  (Pl. Opp'n at 72-73.)  As discussed at length <u>supra</u> Part IV, the record is replete with instances whereby Plaintiffs in these related actions submitted complaints and grievances regarding their MWAP denials and prison officials were either unable or unwilling to provide any relief, pursuant to the MWAP policy.  Plaintiffs should not be denied the opportunity to pursue their grievances in federal court where administrative procedures operated as a dead end to their claims.  <u>See</u> <u>Priatno</u>, 829 F.3d at 123-24.[11]  Accordingly, the Court declines to dismiss Plaintiffs Dockery, Gradia, or Pritchett's claims for failure to exhaust.

---

[11] Where the facts regarding exhaustion are in dispute, courts have denied motions for summary judgment and held an evidentiary hearing for the fact-finder to assess the credibility of witnesses and evidence on exhaustion.  <u>See</u> <u>Jenkins v. Officer S</u>, No. 19-CV-10728 (KMK), 2023 WL 6259667, at *8 (S.D.N.Y. Sept. 26, 2023).  Because the Court determines that DOCCs' administrative procedures involving MWAP operated as a dead end such that administrative remedies were unavailable to Plaintiffs, there is no need for an evidentiary hearing.

V.    **Conclusion**

For the reasons set forth above, the motions for summary judgment before the Court are GRANTED and DENIED as follows:

1. Plaintiff Daniels: State Represented Defendants' motion for summary judgment (23-CV-5654, dkt. no. 14) is GRANTED.

2. Plaintiff Dickinson: State Represented Defendants' motion for summary judgment (23-CV-5657, dkt. no. 14) is DENIED.

3. Plaintiff Dockery: State Represented Defendants' motion for summary judgment (23-CV-5658, dkt. no. 22) is GRANTED in part and DENIED in part.  The motion is GRANTED as to Dr. Hammer and NP Salotti, and DENIED as to Drs. Mueller and Dinello.

4. Plaintiff Gradia: State Represented Defendants' motion for summary judgment (23-CV-5660, dkt. no. 18) is GRANTED in part and DENIED in part.  The motion is GRANTED as to Dr. Hammer and DENIED as to Drs. Mueller and Dinello.

5. Plaintiff Hernandez: State Represented Defendants' motion for summary judgment (23-CV-5661, dkt. no. 29) is DENIED. Dr. Mantaro's motion for summary judgment (23-CV-5661, dkt. no. 24) is GRANTED.

6. Plaintiff Knight: Dr. Lee's motion for summary judgment (23-CV-5662, dkt. no. 12) is DENIED.

7. Plaintiff Mathis: State Represented Defendants' motion for summary judgment (23-CV-5663, dkt. no. 14) is DENIED.

8. Plaintiff Pritchett: State Represented Defendants' motion for summary judgment (23-CV-5664, dkt. no. 16) is DENIED.

9. Plaintiff Rivera Cruz: State Represented Defendants' motion for summary judgment (23-CV-5667, dkt. no. 15) is DENIED.

10. Plaintiff Stewart: State Represented Defendants' motion for summary judgment (23-CV-5668, dkt. no. 16) is DENIED.

Counsel for the parties shall confer and inform the Court by letter no later than April 11, 2025 of how they propose to proceed.

The Clerk of the Court shall also docket this order in each of the following cases listed below and close each of the docket entries listed below.

1. 23-CV-5654, dkt. no. 14

2. 23-CV-5657, dkt. no. 14

3. 23-CV-5658, dkt. no. 22

4. 23-CV-5660, dkt. no. 18

5. 23-CV-5661, dkt. no. 24

6. 23-CV-5661, dkt. no. 29

7. 23-CV-5662, dkt. no. 12

8. 23-CV-5663, dkt. no. 14

9. 23-CV-5664, dkt. no. 16

10.    23-CV-5667, dkt. no. 15

11.    23-CV-5668, dkt. no. 16

**SO ORDERED.**

Dated:    March 28, 2025
         New York, New York

_____
LORETTA A. PRESKA
Senior United States District Judge